Eric SARSFIELD, Individually and as Assignee of the City of Marlborough

v.

GREAT AMERICAN INSURANCE COMPANY OF NEW YORK, Great American Alliance Insurance Company and Great American Assurance Company.

Civil Action No. 07–11026–RWZ.

United States District Court, D. Massachusetts.

June 3, 2008.

Barry C. Scheck, Cochran Neufeld & Scheck, LLP, Deborah L. Cornwall, Neufeld Scheck and Brustin LLP, New York, NY, Nicol S. Fitzhugh, William G. Beck, Lathrop & Gage LC, Kansas City, MO, Kenneth I. Gordon, Boston, MA, for Plaintiff.

John P. Graceffa, Thomas M. Prokop, Morrison Mahoney LLP, Boston, MA, for Defendants.

## MEMORANDUM OF DECISION AND ORDER

ZOBEL, District Judge.

Plaintiff Eric Sarsfield ("Sarsfield") was convicted of rape in July 1987 and served close to ten years in prison. He was exonerated based on DNA evidence in August 2000. Thereafter he sued the City of Marlborough (the "City") and a number of

its current and former employees for federal civil rights violations and state law violations related to his arrest, prosecution and imprisonment. (*See Sarsfield v. City of Marlborough*, Civ. A. No. 03–10319–RWZ.)

Defendants (collectively, "Great American") issued to the City a series of general liability policies, each with a one-year term, for the years 1991–2000. Great American denied the City's request for coverage under the policies, and the City ultimately entered into a settlement with Sarsfield in which it stipulated to its liability and assigned to Sarsfield "all of its rights to recover its defense costs, its settlement payment under this agreement, and any other recoverable costs, expenses, damages, fees and penalties attributable to any rights to insurance coverage it may have...." (Civ. A. No. 03–10319–RWZ, Stipulation for Judgment (Docket # 94).) After a bench trial on damages, this court entered final judgment against the City pursuant to the Stipulation for Judgment, awarding Sarsfield approximately $13 million in damages. (*See* Civ. A. No. 03–10319–RWZ, Judgment (Docket # 97).)

Sarsfield brings the present action to recover the portion of the judgment allocated for the time period after July 1991 [1]

(approximately $11 million) and all attorneys' fees and costs awarded to him in the underlying suit. The parties have filed cross motions for summary judgment, plaintiff on the ground that defendants breached their duty to defend the City in the underlying suit, and defendants on the ground that they had no such duty nor a duty to indemnify. For the reasons discussed below, plaintiff's motion is denied and defendants' motion is allowed.

## I. The Policies

The general liability policies ran from July 1, of one year to July 1, of the next year (*e.g.*, the first policy ran from July 1, 1991 through July 1, 1992). Plaintiff bases his claim for insurance coverage solely upon the "Law Enforcement Liability ("LEL policy" or "policy") coverage included in the general liability policies from July 1992 through July 2000 (the "policy period").[2] Two versions (1993 and 1995) of the LEL policy were used during the policy period.[3] Both versions contain the same relevant language:

> We will pay those sums that the Insured becomes legally obligated to pay as damages because of "wrongful act(s)" which result in:
>
> 1. personal injury;

---

**1.** Although plaintiff seeks damages beginning from July 1, 1991, he relies solely on the Law Enforcement Liability policy which did not come into effect until July 1, 1992. *See infra* note 2.

**2.** (*See* Pl.'s Mem. of Law in Opp. to Defs.' Cross-Mot. for Partial Summ. J. (Docket # 31), 3 n. 3 ("The coverage available under the LEL Forms of the 1992–2000 Great American primary policies, and the corresponding umbrella policies which provide coverage in excess of the LEL coverage during those years, is more than sufficient to satisfy the portion of the judgment allocable to the time period from and after the time Great American became Marlborough's liability insurer. Consequently, for purposes of this case, the

Court need not consider or resolve any issues of coverage under the [general liability] coverage parts to which Great American refers in its brief.").)

**3.** The record does not reflect the LEL policy in effect for the 1992–1993 period (Policy PAC 709–7722–01). Although defendants submitted an LEL policy for this period, it is dated 2001. (*See* Docket # 6–8, 8–13.) This LEL policy contains additional language stating, "However, we will have no duty to defend the Insured against any 'suit' seeking damages because of 'wrongful acts' to which this insurance does not apply." (*Id.* at 8.) This language does not affect the court's analysis.

2. bodily injury;

3. property damage;

caused by an "occurrence" and arising out of the performance of the Insured's duties to provide law enforcement activities.

This insurance applies to "wrongful act(s)" which occurs in the "coverage territory" and during the policy period. We will have the right and duty to defend any "suit" seeking those damages.

. . . .

1. "Bodily Injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

. . . .

3. "Occurrence" means an event, including continuous or repeated exposure to substantially the same general harmful conditions.

4. "Personal Injury" means injury, other than "bodily injury," arising out of one or more of the following offenses:

. . .

 c. false arrest, detention or imprisonment;

 d. malicious prosecution;

. . .

 f. humiliation or mental distress;

. . .

 i. violation of civil rights protected under 42 USC 1981 ET sequential [*sic*] or state law;

. . . .

7. "Wrongful Act(s)" means any or all of the following:

 a. actual or alleged errors;

 b. misstatement or misleading statement;

 c. act or omission; or

 d. negligent act or breach of duty;

by any Insured while performing law enforcement duties.

(Law Enforcement Liability Coverage Form (Ed. 01/93) (Docket # 6–13), 19–23.)

## II. Legal Standard

■ Summary judgment is appropriate where there is no genuine issue as to any material fact and a party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). "Where the facts upon which liability is claimed or denied under an insurance policy are undisputed and the existence or amount of liability depends solely upon a construction of the policy, the question presented is one of law for the court to decide." *Cont'l Cas. Co. v. Canadian Universal Ins. Co.*, 924 F.2d 370, 374 (1st Cir.1991) (internal quotation marks and citation omitted). In Massachusetts [4] an insurance policy is construed under general rules of contract interpretation, with policy language accorded its plain and ordinary meaning. *Brazas Sporting Arms, Inc. v. Am. Empire Surplus Lines Ins. Co.*, 220 F.3d 1, 4 (1st Cir.2000).

## III. Duty to Defend

■ "The question of the initial duty of a liability insurer to defend third-party actions against the insured is decided by matching the third-party complaint with the policy provisions: if the allegations of the complaint are 'reasonably susceptible' of an interpretation that they state or adumbrate a claim covered by the policy terms, the insurer must undertake the defense." *Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co.*, 439 Mass. 387, 788 N.E.2d 522, 531 (2003) (quoting *Cont'l Cas. Co. v. Gilbane Bldg. Co.*, 391 Mass. 143, 461 N.E.2d 209 (1984)). "Specifically, the process is one of envisaging what kinds of

---

**4.** The parties agree that Massachusetts' sub- stantive law applies to this dispute.

losses may be proved as lying within the range of the allegations of the complaint, and then seeing whether any such loss fits the expectation of protective insurance reasonably generated by the terms of the policy." *Id.* (quoting *Sterilite Corp. v. Cont'l Cas. Co.,* 17 Mass.App.Ct. 316, 458 N.E.2d 338 (1983)). The duty to defend is broader than the duty to indemnify. Nonetheless, "when the allegations in the underlying complaint lie expressly outside the policy coverage and its purpose, the insurer is relieved of the duty to investigate or defend the claimant." *Sullivan,* 788 N.E.2d at 531 (internal quotation marks and citations omitted).

Plaintiff filed three successive complaints in the underlying litigation. For present purposes I look to the Third Amended Complaint upon which defendants based their refusal to defend the action.[5] (*See* Civ. A. No. 03–10319–RWZ, Third Am. Compl. and Jury Demand (Docket # 75) ("Complaint").) The Complaint set forth allegations pertaining to the August 24, 1986, rape and the subsequent police investigation culminating in plaintiff's arrest and conviction in July 1987. It set forth eight federal claims based upon 42 U.S.C. § 1983 based upon: unduly suggestive identification procedures (Count I); false arrest and malicious prosecution (Count II); fabrication of inculpatory evidence (Count III); suppression of exculpatory evidence (Count IV); supervisory liability (Counts V and VIII); conspiracy to violate civil rights (Count VI) and unconstitutional custom or practice (Count VII), as well as three state claims for violation of the Massachusetts Civil Rights Act (Count IX), malicious prosecution (Count X) and negligent training and supervision (Count XI). The parties disagree as to whether these wrongful acts

and offenses are covered by the LEL policy.

I start with the language of the policy. It insures against "damages because of 'wrongful act(s)' which result in ... personal injury ... caused by an 'occurrence.'" *See supra.* "Wrongful act," "personal injury," and "occurrence" are terms of art defined in the policy. They are linked to each other by the use of causal connectors such as "because of," "result in," and "caused by." "This construction implies that [wrongful act], injury, and occurrence, while necessarily connected, are nevertheless distinguishable. It means further that each element is expected to occur separately in time." *Eagle–Picher Indus., Inc. v. Liberty Mut. Ins. Co.,* 523 F.Supp. 110, 114 (D.Mass. 1981), *aff'd as modified,* 682 F.2d 12 (1st Cir.1982). The policy covers only damages resulting from "'wrongful act(s)' which occurs ... during the policy period." The first inquiry, therefore, is whether the Complaint alleges any wrongful acts by the insured defendants during the policy period.

As an initial matter, it is worth noting that plaintiff acknowledges that the alleged wrongful conduct by the Marlborough police officers which led to his conviction occurred before any of the policies in issue took effect. However, he alleges that the officers' continued concealment of their misconduct during his incarceration itself constituted a "wrongful act" which resulted in a continuing "injury" caused by an "occurrence," as those terms are defined by the LEL policy. (*See* Compl. ¶ 53; Mem. of Law in Supp. of Pl.'s Mot. for Partial Summ. J. (Docket # 28), 1, 10–11.) Defendants dispute both that the continued concealment constituted a "wrongful act" and that such act caused injury or

---

**5.** Defendants had previously denied coverage in a letter dated May 23, 2002, after learning of plaintiff's claims but prior to his filing the underlying action.

continuing injury to plaintiff during the policy period.

First, "[i]t is the *source* from which the plaintiff's personal injury originates rather than the specific *theories of liability* alleged in the complaint which determines the insurer's duty to defend." *Bagley v. Monticello Ins. Co.*, 430 Mass. 454, 720 N.E.2d 813, 817 (1999) (internal quotation marks and citation omitted). Plaintiff's injuries stem from his arrest and conviction, not from any omissions by the insured defendants during the policy period. His complaint is not "reasonably susceptible" of an interpretation that it states a claim for damages based on wrongful acts during the policy period. None of the claims for damages are based upon the officers' alleged concealment of their misconduct during the time plaintiff was imprisoned. Although plaintiff asserted a claim based on suppression of exculpatory evidence (Count IV), he alleged only that the defendant officers violated his due process and fair trial rights by "fail[ing] to disclose to *the prosecutor* material information that was favorable" to plaintiff. (Compl. ¶¶ 79–80 (emphasis added).) Similarly, his claim based upon a conspiracy to violate his constitutional rights (Count VI) asserted only that the officers "agreed and acted intentionally to withhold and conceal information *from the prosecutor*." (*Id.* ¶ 90 (emphasis added).) These allegations clearly concern pre-conviction conduct.

Mindful that Massachusetts courts often broadly interpret complaint allegations, *see, e.g., Simplex Technologies, Inc. v. Liberty Mut. Ins. Co.*, 429 Mass. 196, 706 N.E.2d 1135, 1137 (1999) (covered loss need only be "allege[d] in the most general terms"), in the interest of a complete analysis the court will assume *arguendo* that the Complaint alleges damages during the policy period based upon the officers' violation of a continuing duty to disclose their misconduct.[6] Under the policy language, the second question is whether such acts resulted in personal or bodily injury to the plaintiff.

The record in this case clearly shows that the alleged concealment during the policy period did not result in injury to plaintiff. It is important to note in this context that the cause of injury for purposes of insurance coverage is not necessarily the same as the cause of injury for purposes of tort liability. *See RLI Ins. Co. v. Simon's Rock Early Coll.*, 54 Mass.App. Ct. 286, 765 N.E.2d 247, 250 (2002).[7] Plaintiff fails to identify any injury resulting from the alleged concealment during the policy period that is distinct from the injuries he incurred when he was convicted and imprisoned. *See Coregis Ins. Co. v. City of Harrisburg*, No. 1:03–CV–920, 2006 WL 860710, *11 (M.D.Pa. Mar. 30, 2006). Moreover, even if the concealment could be said to cause a distinct injury, as noted above the concealment first occurred prior to the policy period and any resulting injury would predate the policy.

**6.** The duty to defend against suits raising reasonably susceptible allegations arises "[i]rrespective of the weakness of the underlying complaint." *Garnet Constr. Co. v. Acadia Ins. Co.*, 61 Mass.App.Ct. 705, 814 N.E.2d 23, 25 (2004). The court therefore expresses no view as to the merits of this claim.

**7.** *See also City of Erie, Pa. v. Guaranty Nat. Ins. Co.*, 109 F.3d 156, 161–62 (3d Cir.1997) ("Statutes of limitation and triggering dates for insurance purposes serve distinct functions and reflect different policy concerns. Statutes of limitation function to expedite litigation and discourage stale claims. But when determining when a tort occurs for insurance purposes, courts have generally sought to protect the reasonable expectations of the parties to the insurance contract.") (internal citations omitted).

The third question is whether, as plaintiff argues, the concealment resulted in a "continuing injury" that triggers coverage under the policy.[8] The court concludes that it did not. Theories of "continuing injury" and "continuous" or "multiple" triggers derive from asbestosis and other "latent" or gradual injury cases where the injuries may have existed but were unknown at the time the insured purchased insurance. *See, e.g., Keene Corp. v. Ins. Co. of N. Am.,* 667 F.2d 1034, 1042–47 (D.C.Cir.1981). In many instances the initial exposure to asbestos occurred during the policy period, but the resulting "manifestation" of the asbestos-related injury did not occur until many years later. As it became "widely known that prolonged inhalation of asbestos has a high probability of causing disease," insurance companies ceased providing coverage for asbestos-related injuries. *Id.* at 1045–46. If coverage were triggered only when the injury manifested, insurance companies would only have to bear a fraction of the insured's total liability for asbestos-related diseases. This result would undermine both the function of the insurance policies and the reasonable expectations of the insured:

> When [the insured] purchased the policies, it could have reasonably expected that it was free of the risk of becoming liable for injuries of which it could not have been aware prior to its purchase of insurance. There is no doubt that these losses would be covered if the diseases at issue developed spontaneously upon inhalation. Inhalation of asbestos is an "occurrence" that causes injury for which [the insured] may be held liable. The possibility that the insurers may not

be liable arises solely because there is a period of time between the point at which the injurious process began and the point at which injury manifests itself. In this case, during that interim period, the existence of latent injury among people who had worked with asbestos became predictable with a substantial degree of certainty. The injury and attendant liability became predictable precisely because it was discovered that past occurrences were likely to have set in motion injurious processes for which [the insured] could be held liable. To accept the argument that only manifestation triggers coverage—and allow insurers to terminate coverage prior to the manifestation of many cases of disease—would deprive [the insured] of the protection it purchased when it entered into the insurance contracts.

*Id.* at 1046. In contrast, applying a "continuous trigger" maximized insurance coverage by implicating all policies in effect from the date of exposure to the date of manifestation. *See generally* James M. Fischer, *Insurance Coverage for Mass Exposure Tort Claims: The Debate Over the Appropriate Trigger Rule,* 45 Drake L. Rev. 625, 646–50 (1997). The rationale underlying application of the "continuous trigger" theory in the insurance coverage context makes clear that it is not well-suited to a situation, where, as here, any injury was evident from the outset and first occurred prior to the inception of insurance coverage.

Malicious prosecution cases present a somewhat closer analogy to the present case. *See Heck v. Humphrey,* 512 U.S. 477, 484–86, 114 S.Ct. 2364, 129 L.Ed.2d

---

8. " 'Trigger of coverage' is a term of art whereby the court describes what must occur during the policy period for potential coverage to commence under the specific terms of an insurance policy." *A.W. Chesterton Co. v.*

*Massachusetts Ins. Insolvency Fund,* 445 Mass. 502, 838 N.E.2d 1237, 1250 (2005) (internal quotation marks and citations omitted).

383 (1994) (favorably comparing malicious prosecution claims and § 1983 claims that require plaintiff to prove the unlawfulness of his confinement).[9] Although in most instances the claim for malicious prosecution does not accrue until the person who was wrongfully convicted is exonerated, a majority of courts have held that the injury, for insurance purposes, occurs when the underlying criminal charges are filed. *See, e.g., City of Erie, Pa. v. Guaranty Nat. Ins. Co.*, 109 F.3d 156, 160 (3d Cir. 1997); *Royal Indem. Co. v. Werner*, 979 F.2d 1299, 1300 (8th Cir.1992); *Newfane v. Gen. Star Nat'l Ins. Co.*, 14 A.D.3d 72, 77, 784 N.Y.S.2d 787 (N.Y.App.Ct.2004), and cases cited therein. As the Third Circuit noted, "[i]n malicious prosecution cases, there is no interval between arrest and injury that would allow an insurance company to terminate coverage. The plaintiff faces incarceration, humiliation, and damage to reputation as soon as charges are filed. Perhaps for this reason, no federal or state court has adopted the multiple trigger theory in malicious prosecution cases." *City of Erie*, 109 F.3d at 165.

 As with *Keene*, the recognition that a contrary result would contravene the parties' reasonable expectations underlies these cases. In construing a policy, it is appropriate "to consider what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." *Tr. of Tufts Univ. v. Commer-*

cial *Union Ins. Co.*, 415 Mass. 844, 616 N.E.2d 68, 72 (1993) (quoting *Hazen Paper Co. v. United States Fid. & Guar. Co.*, 407 Mass. 689, 555 N.E.2d 576 (1990)). It would be unreasonable for the City to expect the LEL policy to cover liability for tortious acts committed before its inception. *See N. River Ins. Co. v. Broward County Sheriff's Office*, 428 F.Supp.2d 1284, 1290 (S.D.Fla.2006) (rejecting coverage for lawsuits involving former inmates incarcerated prior to the policy period and later exonerated, noting, "it is inconceivable that the calculation of the premium that Broward County [the insured] paid North River [the insurer] in order to purchase the Policy included an analysis of *any* earlier prosecutions in Broward County and the likelihood of malfeasance over the course of those prosecutions").

## IV. Duty to Indemnify

 The duty to defend is broader than the duty to indemnify. "If an insurer has no duty to defend, based on the allegations in the plaintiff's complaint, it necessarily follows that the insurer does not have a duty to indemnify." *Bagley*, 720 N.E.2d at 817, citing *United Nat'l Ins. Co. v. Parish*, 48 Mass.App.Ct. 67, 717 N.E.2d 1016, 1020 (1999). Plaintiff cannot establish otherwise by reference to the consent judgment it unilaterally entered into with the City. *See Bartholomew v. Appalachian Ins. Co.*, 655 F.2d 27, 29 (1st Cir.1981)

---

9. Indeed, it is questionable whether plaintiff would have a claim based on concealment of misconduct which is separate from his malicious prosecution claim:

> Reflective of the fact that false imprisonment consists of detention without legal process, a false imprisonment ends once the victim becomes held *pursuant to such process*—when, for example, he is bound over by a magistrate or arraigned on charges. Thereafter, unlawful detention forms part of the damages for the "entirely distinct" tort of malicious prosecution, which remedies

> detention accompanied, not by absence of legal process, but by *wrongful institution* of legal process. If there is a false arrest claim, damages for that claim cover the time of detention up until issuance of process or arraignment, but not more. From that point on, any damages recoverable must be based on a malicious prosecution claim and on the wrongful use of judicial process rather than detention itself.

*Wallace v. Kato*, 549 U.S. 384, 127 S.Ct. 1091, 1096, 166 L.Ed.2d 973 (2007) (internal quotation marks and citations omitted).

("Plaintiffs' extended argument that the insurers' responsibility could be established by the consent judgment to which it was not a party is equally fallacious.").

## V. Conclusion

I am sympathetic to plaintiff's position and recognize that this decision may preclude him from ever being fully compensated for the losses he has suffered. Nevertheless, I am persuaded that, for the reasons given above, defendants' cross-motion for summary judgment (Docket # 23) must be ALLOWED, and plaintiff's cross-motion for partial summary judgment (Docket # 26) DENIED.