RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 10a0235p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

CLARENCE ELKINS; BRANDEN ELKINS;
CLARENCE ELKINS, JR.; MELINDA ELKINS,
                  *Plaintiffs-Appellees,*

      *v.*

SUMMIT COUNTY, OHIO; MICHAEL KALLAI,
Chief of Police; PETER MAURER, Sergeant; B.
DAVIS, Detective,
                  *Defendants,*

DANTON ADAIR, Officer; M. HUDAK,
Detective; J.L. FLAKER, Detective; DON
ADAMSON, Sergeant; JIM WEESE, Detective,
in their individual and official capacities,
                  *Defendants-Appellants.*

No. 09-3680

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 06-03004—James S. Gwin, District Judge.

Argued: June 9, 2010

Decided and Filed: August 10, 2010

Before: MARTIN, RYAN, and KETHLEDGE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** John T. McLandrich, MAZANEC, RASKIN, RYDER & KELLER CO., L.P.A.,
Cleveland, Ohio, for Appellants. Russell Ainsworth, LOEVY & LOEVY, Chicago, Illinois,
for Appellees. **ON BRIEF:** John T. McLandrich, Frank H. Scialdone, MAZANEC,
RASKIN, RYDER & KELLER CO., L.P.A., Cleveland, Ohio, for Appellants. Russell
Ainsworth, Jonathan Loevy, LOEVY & LOEVY, Chicago, Illinois, for Appellees.

_____

**OPINION**

_____

BOYCE F. MARTIN, JR., Circuit Judge.  A jury convicted Clarence Elkins, Sr., of raping and murdering his mother-in-law, Judith Johnson, and of assaulting and raping his six-year-old niece, Brooke Sutton.  The jury sentenced him to life in prison with no eligibility for parole.  Seven years later, Elkins obtained DNA evidence that proved that Earl Mann, Johnson's neighbor at the time of the murder, had committed the crimes, and Elkins was exonerated.  The case against Elkins was dismissed, and the State of Ohio awarded him $1,075,000 in a wrongful imprisonment settlement.

Thereafter, Elkins brought suit on a variety of state and federal claims in the United States District Court in the Northern District of Ohio against the City of Barberton, Ohio, and multiple officers and detectives who had investigated the Johnson murder.  Elkins claimed that the officers failed to disclose to the prosecution a memorandum that would have exonerated him.  The officers and the city moved for summary judgment on all the claims, asserting that they were entitled to qualified immunity and state sovereign immunity.  The court dismissed the claims against the city and granted the officers qualified immunity on all claims except:  (1) the *Brady* violation of Elkins' constitutional right to due process under 42 U.S.C. § 1983 claim; and (2) the state-law malicious prosecution and loss of consortium claims.  We affirm.

I.

On June 6, 1998, Johnson was raped and murdered in her home at Barberton, Ohio.[1] Her six-year-old granddaughter, Brooke, was also assaulted and raped.  Based on Brooke's statement that the rapist looked like her uncle, Elkins, the Barberton police arrested Elkins.  Shortly thereafter, he was indicted on charges of aggravated murder, attempted aggravated murder, rape, and felonious assault.

---

[1]Facts are drawn from the district court opinion.  *See Elkins v. Summit County*, *Ohio,* No. 5:06-CV-3004, 2009 WL 1150114, at *1 (N.D. Ohio Apr. 28, 2009).

On January 5, 1999, while the Elkins investigation was ongoing, Mann was arrested by the Barberton police for two "strong-arm" robberies.[2] During the course of the arrest, Mann, who was drunk, asked a patrol officer, Gerard Antenucci, "Why don't you charge me with the Judy Johnson murder?" In compliance with his training that mandated reporting anything that officers believed the Detective Bureau should know about, Antenucci wrote an interdepartmental memorandum memorializing Mann's statement and directed it to the department that was investigating Johnson's murder. Antenucci later testified that he wrote the memorandum that day and placed it in a mail box that, according to department procedures,[3] was emptied each day by a member of the Detective Bureau and disseminated to the detectives working on the specific case. However, the Mann memorandum was not disclosed to Elkins or the prosecution and was never produced.

At trial, Brooke identified Elkins as the perpetrator. However, Elkins presented substantial evidence that someone else committed the crime. Elkins' then-wife, Melinda Elkins, who is Johnson's daughter, testified that Elkins had been at home with her, forty miles away from Johnson's house, at the time of the crime. Other witnesses testified to having spent time with Elkins during the evening until shortly before the murder occurred. More significantly, the officers recovered pubic hair and head hairs from Johnson's anus and Brooke's nightgown that, when subjected to DNA analysis, did not match Elkins' hair. The officers obtained hair samples from several other individuals, attempting to find a DNA match, but did not succeed. On June 4, 1999, a jury convicted Elkins on all charges and sentenced him to life imprisonment with no eligibility for parole.

---

[2]Strong-arm robberies are robberies in which the victim is surrounded by a group of individuals who brutally beat the victim while robbing him or her.

[3]These procedures were not contested at the trial.

In 2002, Brooke recanted her testimony, but the state did not reverse its conviction. The same year, through a series of breathtakingly improbable coincidences,[4] Elkins began to suspect that Mann was Johnson's murderer and was able to obtain a DNA sample from him. Subsequent testing revealed that Mann's DNA matched the DNA found at the Johnson murder scene, and after an investigation, Elkins was released from prison after serving seven years. Mann ultimately pled guilty to Johnson's murder, and the criminal case against Elkins was dismissed. The Summit County Court of Common Pleas found that Elkins was wrongfully imprisoned and the State of Ohio awarded him $1,075,000 in a wrongful imprisonment settlement.

On December 18, 2006, Elkins brought suit against multiple defendants, including the City of Barberton, Officer Danton Adair, Detective M. Hudak, Detective J.L. Flaker, Sergeant Don Adamson and Detective Jim Weese on multiple state and federal claims. The individual defendants requested summary judgment, alleging that they were protected from suits by qualified immunity and state sovereign immunity.

The district court dismissed the claims against the city and granted summary judgment to the officers on all claims but the section 1983 due process claim, the state-law malicious prosecution claim, and the derivative state-law loss of consortium claim. The court held that, in a summary judgment posture, it must infer that the detectives both received and failed to disclose the memorandum, and that the failure to disclose the memorandum violated Elkins' right to due process. It further held that Elkins had presented sufficient evidence to show that the officers acted in bad faith or were reckless in failing to disclose the memo, and therefore provided sufficient evidence to support the state-law malicious prosecution claim. The officers timely appealed.

---

[4]Elkins became aware of a news report stating that Mann had been arrested and convicted of molesting his three young daughters while living next door to Johnson. As luck would have it, Mann was sentenced to prison and transferred to the same facility where Elkins was housed. Elkins noticed that Mann left a cigarette butt on a table in the recreational area. He requested that another prisoner watch the butt while he obtained toilet paper in order to recover the cigarette without tainting any DNA evidence. Elkins then spent the next two weeks illicitly attempting to get a plastic bag through the prison black market so that he could smuggle the cigarette out of prison for his attorney to test, which he eventually did. The testing showed that Mann's DNA matched the DNA found at the scene of the Johnson murders. (Appellee Br. at 14-15.)

II.

We review the district court's denial of summary judgment de novo. *Moldowan v. City of Warren*, 578 F.3d 351, 373 (6th Cir. 2009). "Summary judgment is proper 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Id.* at 373-74 (quoting FED.R.CIV.P. 56(c)). "A genuine issue of material fact exists when there are 'disputes over facts that might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "However, '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.''" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "That Defendants' motions for summary judgment were based on claims of . . . qualified immunity does not affect the standard of review that applies. [This] is a legal question that this Court reviews *de novo*." *Id.* (internal citation omitted).

III.

Elkins brings claims under 42 U.S.C. § 1983, alleging that the officers deprived him of his constitutional right to a fair trial when they failed to disclose the Mann memorandum to the defense, evidence that Elkins claims would likely have made a substantial difference to the outcome of his trial. He also advances a state-law malicious prosecution claim and derivative loss of consortium claim. The officers respond that they are entitled to qualified immunity and state sovereign immunity on all the claims and, thus, the district court erred in denying them summary judgment on Elkins' section 1983 violation claim, and the state malicious prosecution and loss of consortium claims.

*A.        Section 1983 Claim*

*1.        Qualified Immunity*

In evaluating qualified immunity claims, we "[f]irst . . . determine whether a constitutional violation occurred; second, we determine whether the right that was violated was a clearly established right of which a reasonable person would have known." *Moldowan*, 578 F.3d at 375.[5] The officers claim first that they are entitled to qualified immunity on the due process claim because Elkins has not presented sufficient evidence demonstrating that the officers actually received the Mann memorandum and that, had they received it, he cannot show that the memorandum was apparently exculpatory.

Although the officers either deny having seen the memorandum or did not testify regarding the memorandum, they do not contest that Antenucci created and dispatched the memorandum to the Detective Bureau in accordance with department policies. There is also no dispute that the memorandum, if mailed, would have been delivered to the detectives assigned to the case. Evidence adduced at trial reveals that no other relevant document in the case was missing, and that the incident report regarding Mann's robbery, which was also placed into the mailbox along with the Mann memorandum, was received by the detectives and preserved. It is also uncontested that the Mann memorandum was never delivered to the prosecutor or Elkins.

Given that, when appealing a denial of qualified immunity, "the defendant must . . . be willing to concede the most favorable view of the facts to the plaintiff for purposes of the appeal," *id.* at 370,[6] we agree with the district court's conclusion that

---

[5]The officers allege that the district court applied the wrong legal standard to the case. While *Moldowan*, which is this Court's most recent iteration of the relevant law, had not been decided at the time of the district court's opinion, the district court's analysis is legally sound.

[6]"[F]ederal appellate courts have jurisdiction to hear interlocutory appeals considering 'the legal question of qualified immunity, *i.e.*, whether a given set of facts violates clearly established law.'" *Moldowan*, 578 F.3d at 369 (quoting *Farm Labour Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 531 (6th Cir. 2002)). "Our jurisdiction is limited to resolving pure questions of law . . . [and] we lack jurisdiction to consider a 'district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial.'" *Id.* at 369-70 (quoting *Johnson v. Jones*, 515 U.S. 304, 313 (1995).

"the Court must assume that the Mann memo was delivered to the [officers] working the Elkins case, according to police policy and custom," and also assume that "having read the memo, the [officers] withheld it, never divulging it to the prosecution, thereby preventing it from being disclosed to the defense." *Elkins*, 2009 WL 1150114, at *8.

Having assumed that the officers received the Mann memorandum and did not divulge it, we must next determine whether that failure violated Elkins' constitutional right to due process. "'[T]he suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *Moldowan,* 578 F.3d at 376-77 (quoting *Brady*, 373 U.S. at 87). Traditionally, this duty applied to prosecution rather than police, but in *Moldowan*, we held that "the due process guarantees recognized in *Brady* also impose an analogous or derivative obligation on the police [to disclose to the prosecutor evidence whose materially exculpatory value should have been "apparent" to him at the time of his investigation]." *Id.* at 382, 388. Thus, Elkins had a constitutional right to have favorable evidence disclosed to the prosecution and court.

Next, we must determine whether the "'contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violate[d] that right,'" *id.* at 382 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) at the time the officers failed to disclose the Mann memorandum—in this case, January 5, 1999, the date that Antenucci wrote and mailed the memorandum to the officers. In *Moldowan*, we found that "at least three circuits recognized prior to August 1990 . . . this right was clearly established," *id.*, and that the right may have been clearly established as early as 1964. *Id.* Thus, Elkins' right to have the Mann memorandum disclosed was clearly established on January 5, 1999.

*2.     Apparent Exculpatory Nature of the Memorandum*

Having determined that Elkins' claims against the officers implicate a clearly established constitutional right, we must next determine whether, taking the facts alleged by Elkins as true, Elkins can show a violation of this right.  In order to do so, Elkins must provide evidence that "'the exculpatory value' of the evidence [was] 'apparent.'" *Moldowan*, 578 F.3d at 388 (quoting *California v. Trombetta*, 467 U.S. 479, 489 (1984)). *Moldowan* is grounded in two Supreme Court cases, *Arizona v. Youngblood*, 488 U.S. 51 (1988) and *California v. Trombetta*, 467 U.S. 479.  Although *Youngblood* established that police cannot be held accountable for failing to divine the materiality of every scrap of evidence, *Trombetta* holds that when police have in their possession a piece of evidence that "might be expected to play a significant role in the suspect's defense," *Id.* at 488, they have a constitutional duty to preserve that evidence.

Thus, the question for us is whether the exculpatory value of the Mann memorandum would have been apparent to the detectives given the state of the case at the time.  *See Moldowan*, 578 F.3d at 388-89; *Trombetta*, 467 U.S. at 487-88.  While we have never elucidated a test for determining what evidence is apparently exculpatory, there is no question that, in light of the broad range of evidence available to the officers at the time, the Mann statement "cast serious doubt on, if not entirely discredit[ed Brooke's] identification of [Elkins]."  *Moldowan*, 578 F.3d at 382.  Even less would have been sufficient.

The case against Elkins was flimsy at best.  His conviction relied primarily upon the testimony of a six-year-old child who had been attacked in her bed in the dark, savagely raped, and never clearly saw her attacker.  On the morning following her rape, Brooke went to Mann's house for help.  When Mann's wife answered the door, she did not call 911 or alert the police, but instead asked Brooke—who was covered in blood—to wait on the front porch and then drove her home, behavior that is highly unusual if not suspect.  Additionally, several witnesses testified that Elkins was home with his wife, forty miles away from the scene of the crime, at the time it took place.  Moreover, the officers knew that body hair found in Johnson's anus and on Brooke's

nightgown suggested that someone other than Elkins had sodomized and murdered Johnson and then raped Brooke.

Mann, who was out of prison on parole, was arrested for committing violent crimes, two "strong-arm" robberies. When the police arrested him, he listed his address as being next door to Johnson. Moreover, when Mann made the incriminating statement to Antenucci, Antenucci found the statement so obviously exculpatory that he memorialized it in a memorandum that he forwarded to the detectives on the Elkins' case.

The officers had all of this information available to them at the time that they received the memorandum. Furthermore, they knew that the case against Elkins was weak and had been attempting to identify other suspects whose DNA matched the DNA found at the crime scene. Thus, it is clear that Mann's statement, which linked him directly to Johnson's murder, "might be expected to play a significant role in [Elkins'] defense." *Id.* at 388. Therefore, the Mann memorandum was apparently exculpatory in light of the whole case at the time, and the officers' failure to disclose it violated Elkins' right to due process.

Thus, we affirm the district court's denial of summary judgment as to the officers' liability on Elkins' section 1983 claim.

### B.          *State-Law Malicious Prosecution and the Derivative Loss of Consortium Claims*

The district court granted Elkins summary judgment on his state-law malicious prosecution claims, finding that he had "presented sufficient evidence at the summary judgment stage to show that the [officers] withheld exculpatory evidence more than negligently." *Elkins*, 2009 WL 1150114, at *13. The officers appeal, claiming that Elkins failed to provide sufficient evidence that they acted maliciously, in bad faith, or recklessly. *See* O.R.C. § 2744.03(A)(6)(b) (granting employees of political subdivisions immunity from civil liability unless the acts that formed the basis of the claim were committed with "malicious purpose, in bad faith, or in a wanton and reckless manner.").

Under the Ohio law in place at the time that Elkins' claims accrued, we do not have jurisdiction to review an interlocutory appeal of a denial of immunity from liability under state law. *See Chesher v. Neyer*, 477 F.3d 784, 794 (6th Cir. 2007) (holding that the April 9, 2003 amendment of the Ohio Revised Code section 2744.03 making a denial of immunity immediately appealable applies *only prospectively* to claims accruing after the effective date of the amendment). "Our jurisdiction thus turns on whether the claims to which the denial of immunity applied accrued on or after [the 2003 amendment]." *Id.* As the statements by Mann occurred on January 5, 1999 and Elkins was convicted on June 4, 1999, there is no question that Elkins' state law claims accrued in 1999, prior to the 2003 amendment. Thus, we do not have jurisdiction to review them.[7]

IV.

For the reasons set forth above, we AFFIRM the district court's denial of summary judgment.

---

[7]Furthermore, were we to review the state claims, we would find that Elkins has presented evidence sufficient to withstand summary judgment on the question of whether the officers' failure to disclose the memorandum was more than negligent. Officers allegedly told Johnson's daughter, who discovered a lampshade bearing two bloody hand-prints in Johnson's house following the police investigation, that they did not need the lampshade "because they had enough evidence already." Moreover, an alibi witness, Sue Dalton, testified that, when she informed the officers that she had seen Elkins the night of the murder and did not believe that he committed the crime, the officers allegedly responded, "we got our man, we know for a fact that we have our man." When Dalton continued to protest, the officers allegedly told her that, if she did not distance herself from Elkins, she would end up in jail. *Id.* Furthermore, one of the officers allegedly falsified a police report to hide evidence that Brooke was unsure that Elkins had attacked her. *Id.* In addition, Elkins has presented unrefuted testimony that the apparently exculpatory Mann memorandum was mailed to the officers.