NOT RECOMMENDED FOR PUBLICATION
File Name: 17a0495n.06

No. 16-4199

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Aug 24, 2017
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| SELECTIVE INSURANCE COMPANY OF THE SOUTHEAST, | ) ) ) | |
| Plaintiff-Appellee, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| v. | ) ) ) | |
| RLI INSURANCE COMPANY, | ) ) | |
| Defendant-Appellant. | ) ) ) | |

BEFORE:    GUY, ROGERS, and KETHLEDGE, Circuit Judges.

ROGERS, Circuit Judge.  In 2014, police in the City of Barberton, Ohio, agreed to pay $5.25 million to settle malicious prosecution and deprivation-of-due-process claims arising out of wrongful conviction of a man named Clarence Elkins.  Two of the City's insurers—Selective Insurance Company of the Southeast and RLI Insurance Company—now dispute which of them is responsible for the $3.25 million in excess coverage to pay for this settlement.  The district court accepted Selective's contention that RLI's coverage was triggered when Elkins was first arrested, before the end of RLI's coverage period, even though the police had probable cause to arrest at that point.  However, coverage was not in fact triggered until several months after RLI's coverage period ended, when police withheld new exculpatory evidence from Elkins's lawyers, and there was then no longer probable cause.  Although Elkins suffered injury during RLI's coverage period, that injury preceded any tortious activity by the police, and thus was not the

result of the tortious activity as required by the RLI policy. The district court accordingly erred in assigning liability to RLI.

In the early morning hours of June 7, 1998, an intruder raped and murdered fifty-eight-year-old Judith Johnson in her own home, and then raped and beat unconscious Johnson's six-year-old granddaughter, Brooke Sutton. A few hours later, Brooke regained consciousness and wandered over to the house of a neighbor looking for help. Brooke told the neighbor that her grandmother had been killed and that the perpetrator "looked like my Uncle Clarence." The neighbor eventually drove Brooke to her mother's house, and her mother called the police. At some point, Brooke's belief that the perpetrator looked like her Uncle Clarence turned into certainty that it was in fact her Uncle Clarence: As Brooke later attested, "I remember telling everyone in the beginning that the person who killed my grandmother and attacked me looked like my Uncle Clarence. . . . I am not really sure how this quickly went from looking like my Uncle Clarence to being my Uncle Clarence. Whenever it was repeated back to me, it was said like I was sure it was Uncle Clarence so I just got the clue." On the basis of this identification, Barberton police arrested Brooke's uncle and Johnson's son-in-law Clarence Elkins on June 8. On June 10, a grand jury indicted Elkins on charges of aggravated murder, attempted aggravated murder, rape, and felonious assault.

Over the next month, Barberton detectives investigated the Johnson murder, but failed to follow up on information that may have exculpated Elkins. On June 8, a good friend of Judith Johnson's told police that six-year-old Brooke had told her that she did not know who the intruder was. However, police falsified the friend's statements to say that Brooke had confirmed the intruder was Elkins. On June 12, one of Elkins's friends told detectives that she had seen Elkins on the night of the murder—he had been drinking with his wife and other friends until

later in the evening, forty miles from the scene of the crime—providing an alibi. The detectives responded by saying "we got our man, we know for a fact that we have our man." On June 16, DNA testing revealed that a foreign pubic hair and head hair recovered from Johnson's anal area could not have come from Elkins. Finally, on June 25, Johnson's daughter—Brooke's mother— discovered two bloody handprints on a lampshade that had belonged to Johnson, but was told by police to throw the lampshade away. The daughter also found her mother's bloody glasses, dentures, and a Polaroid camera with bloody fingerprints—all of which had been left behind by police investigators.

On June 29, 1998, the pivotal event for this case occurred: the City of Barberton switched insurance carriers. Like many cities, Barberton maintained both primary and excess liability insurance. On June 29, 1998, the City switched primary carriers from National Casualty Company (NCC) to CNA, and excess carriers from RLI Insurance Company to Selective Insurance Company. Both primary carriers had a duty to defend the City and individual officers in the event of a lawsuit and were responsible for covering up to $1 million in damages. Both excess carriers were responsible for liability beyond the initial $1 million in damages—up to the policy limit—with no duty to defend.

Six months later, Barberton detectives again failed to follow up on information that may have exculpated Elkins. On January 5, 1999, a Barberton police officer arrested a man named Earl Mann for two aggravated robberies. During his arrest, Mann reportedly asked the arresting officer: "Why aren't you charging me with the Judy Johnson murder too?" Mann also reportedly disclosed to the officer that he had been living with his common-law wife since being released from prison the previous June, in a house that happened to be next door to Judith Johnson's former residence. Following his training, the officer prepared an inter-departmental

memorandum containing this information (the "Mann memorandum") and put this memorandum in a bin intended for documents to be shared with the detective bureau. However, Elkins's criminal defense attorneys were never given the memorandum. The chief of Barberton's detective bureau—who should have been the one to collect the memorandum from this bin—was terminally ill and later died during the course of the underlying lawsuit without being deposed.

Four months later, Elkins was tried by jury. *Elkins v. Summit Cty., Ohio*, 615 F.3d 671, 674 (6th Cir. 2010). Brooke Sutton identified Elkins as the perpetrator at trial. To rebut this identification, Elkins's alibi witnesses testified that they had been with Elkins at the time of the crime, forty miles from Johnson's house. Elkins's wife—Johnson's daughter—corroborated this alibi. Elkins also put forth DNA evidence that the hairs found on Johnson's body could not have come from him. Nevertheless, the jury convicted Elkins on all charges in June 1999. He was sentenced to life with no eligibility for parole until 2054.

After Elkins's conviction, the evidence against him began to erode. In 2002, Brooke Sutton recanted her testimony, saying that she had been swayed by the adults around her and that she no longer believed Elkins was the perpetrator. The same year, Elkins learned in a news report that Earl Mann—the man whose incriminating statements had not been disclosed to Elkins's lawyers—had lived next to Johnson at the time of the murder and had been convicted of molesting three young children in separate cases. *Elkins*, 615 F.3d at 674 n.4. By chance, Elkins was incarcerated in the same prison as Mann. Elkins managed to get one of Mann's cigarette butts, smuggle it out of prison, and have it tested for Mann's DNA. The test confirmed that Mann's DNA matched the DNA found on Johnson's body. On the basis of this DNA evidence, Elkins was exonerated and released in 2005.

In 2006, Elkins and his family brought suit in federal court against the City of Barberton and several individual police detectives and officers ("the Barberton defendants") for, among other things, malicious prosecution under Ohio law and deprivation of due process under 42 U.S.C. § 1983. *See Elkins v. Summit Cty., Ohio*, No. 5:06-CV-3004, 2009 WL 1150114 (N.D. Ohio Apr. 28, 2009). The City of Barberton notified its pre-June-29-1998 primary insurer, NCC, which then retained an attorney for the City and the individual officers. Initially, Elkins focused on alleged misconduct at the beginning of his arrest and indictment, such as the falsification of one witness's account, the discrediting of an alibi witness account, and the failure to follow up on the DNA evidence. During discovery, however, Elkins learned for the first time that detectives had failed to turn over the exculpatory Mann memorandum to him.

This Mann memorandum turned out to be crucial for Elkins's case. After the close of discovery, the City asserted sovereign immunity and the individual defendants asserted qualified immunity. *Elkins*, 2009 WL 1150114, at *2. The district court held that there was sovereign immunity for the City and qualified immunity for several of Elkins's claims, but denied immunity for the individual defendants with respect to Elkins's 42 U.S.C. § 1983 deprivation-of-due-process claim and Ohio malicious-prosecution claim. *Id.* at *9-*11. The court reasoned that withholding the exculpatory Mann memorandum violated Elkins's clearly established constitutional rights under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), which was enough for the § 1983 claim to continue. *Elkins*, 2009 WL 1150114, at *8-*9. The court further reasoned that, even if the police did have probable cause to arrest and indict Elkins based on Brooke Sutton's initial identification, the probable cause had "evaporated" upon discovery of the Mann evidence, such that the malicious prosecution claim could survive as well. *Id.* at *10-*11.

On interlocutory appeal, this court largely agreed with the district court's analysis, with a few differences. *See Elkins v. Summit Cty., Ohio*, 615 F.3d 671, 677 (6th Cir. 2010). First, we affirmed the denial of qualified immunity for the § 1983 deprivation-of-due-process claim, reasoning that the Mann memorandum would have "cast serious doubt on, if not entirely discredited Brooke's identification of Elkins." *Id.* (citation, quotation, and brackets omitted). However, we noted that "[e]ven less would have been sufficient" because "[t]he case against Elkins was flimsy at best." *Id.* We noted the unreliability of a recently brutalized six-year-old's identification, the discrediting of Elkins's alibi witnesses, and the mismatch between Elkins's DNA and the DNA from the hairs found on Johnson's body. *Id.* Second, we held that the Sixth Circuit lacked jurisdiction to review a denial of immunity for the malicious prosecution claim, because Elkins's offense had accrued before a 2003 change in Ohio law authorizing appellate courts to review interlocutory appeals from orders denying immunity. *Id.* at 678. In reaching this holding, we reasoned that "there is no question that Elkins' state law claims accrued in 1999, prior to the 2003 amendment," because "the statements by Mann *occurred on January 5, 1999* and Elkins was convicted on June 4, 1999." *Id.* (emphasis added). This holding of no jurisdiction also had the same result as an affirmance, because Elkins was able to pursue his malicious prosecution claim against the Barberton defendants.

Our court then remanded the case for trial. On August 12, 2010, the Barberton defendants sent formal notice of the expected trial or settlement to the insurers that had heretofore not been involved in the litigation, including RLI and Selective. Simultaneously, the district court scheduled pre-trial mediation for November 2010, and trial in December 2010. Settlement negotiations began before mediation. Selective participated in these negotiations. However, RLI did not participate: On August 23, twelve days after being notified of the lawsuit

along with the other insurers, RLI sent notice that it considered all of the events leading to liability for the Elkins suit to have occurred after its policy period elapsed.

In November 2010, Elkins, the Barberton defendants, and the three participating insurers settled at mediation for $5.25 million. Responsibility for this settlement was split among the three participating insurers: The pre-June-29-1998 primary insurer NCC paid $1 million, its policy limit; the post-June-29-1998 primary insurer CNA also paid $1 million, its policy limit, and Selective paid $3.25 million in excess coverage. Selective was also assigned all of the rights the Barberton defendants enjoyed vis-à-vis RLI, enabling Selective to sue RLI under the City of Barberton's insurance policy. The settlement agreement made clear that it extinguished all of Elkins's claims against the defendants and their insurers, but did not link the $5.25 million payment to either the § 1983 deprivation-of-due-process claim or the Ohio malicious prosecution claim.

In July 2012, Selective brought the current action against RLI, seeking declaratory judgment and monetary relief for the $3.25 million in excess coverage that Selective had paid under the settlement agreement with Elkins. Both parties moved for summary judgment in January 2013. In its motion for summary judgment, RLI argued that it was not responsible for either Elkins's § 1983 deprivation-of-due-process claim or his Ohio malicious-prosecution claim. RLI argued that the basis for both claims was the withholding of the Mann memorandum—an alleged *Brady* violation strong enough to overcome qualified immunity—which occurred in January 1999, six months after the RLI policy period ended. Turning to the language of its policy with the City of Barberton, RLI noted that it was only responsible for "all sums which the insured becomes legally obligated to pay . . . because of . . . [p]ersonal injury . . . caused by an

occurrence which takes place during the policy period." "Personal injury" was clearly defined to include "malicious prosecution," and "occurrence" was defined as:

> . . . an act or series of acts of the same or similar nature committed during this policy period. Such act or series of acts must constitute an offense included in the definition of the term personal injury in this policy. All loss arising out of such act or series of acts, regardless of the frequency thereof or the number of claimants, shall be deemed to arise out of one offense . . . .

In other words, according to RLI, it was responsible only for an "act or series of acts" that together "constitute an offense"—such as malicious prosecution—that was "committed during th[e] policy period." Therefore, because the alleged *Brady* violation that was the basis of Elkins's claims occurred outside of the RLI policy period, RLI concluded that it could not be responsible for any of the liability arising out of Elkins's suit against the Barberton defendants.

The district court, however, disagreed with RLI, reasoning that "[a]s the Court sees it, for the purposes of the present dispute, RLI assigns undue significance to the alleged *Brady* violation." According to the district court, although the January 1999 *Brady* violation was enough on its own for Elkins's malicious prosecution claim, there was also evidence of wrongdoing by the Barberton defendants that occurred during RLI's policy period, such as the dismissal of alibi witnesses and the DNA mismatch. Therefore, Elkins may have had a viable malicious prosecution claim even before the alleged *Brady* violation, including during the RLI policy period. The district court then relied on what it called the "majority rule" from other circuits that have addressed insurance liability for malicious prosecution claims, which holds that coverage for malicious prosecution is triggered at the time that the underlying criminal charges are filed. *See Genesis Ins. Co. v. City of Council Bluffs*, 677 F.3d 806, 813 (8th Cir. 2012); *City of Erie, Pa. v. Guar. Nat. Ins. Co.*, 109 F.3d 156, 160 (3d Cir. 1997). Accordingly, the district

court held that RLI's policy was triggered when Elkins was first arrested, making RLI liable for the entire amount in excess coverage that Selective had paid out.[1]

RLI filed a subsequent motion for summary judgment, making two more arguments: First, RLI argued that the Barberton defendants—whose rights Selective had been assigned—had only notified RLI about the Elkins lawsuit four years after its commencement, violating an express provision of the policy and prejudicing RLI's ability to defend itself. RLI contended that this was enough to dismiss Selective's case. Second, RLI argued that, even if its policy was triggered, the court should apply an equitable "time-on-risk analysis," which would make RLI and Selective proportionally liable for the relative time they were excess insurers while the malicious prosecution was occurring. The district court rejected these arguments as well, concluding that any delayed notification had not prejudiced RLI and that Ohio law did not recognize the time-on-the-risk allocation. The district court therefore entered judgment in favor of Selective, holding that RLI was responsible for the entire excess amount of $3.25 million that Selective had paid out, plus pre-judgment interest.

RLI now appeals, repeating three of its arguments before the district court.

RLI is not liable for the excess liability claim because no tort occurred prior to the expiration date of RLI's policy. The RLI policy is occurrence-based and contains the following language relevant to the instant dispute:

> [RLI] will pay on behalf of the insured all sums which the insured becomes legally obligated to pay as ultimate net loss, because of . . . [p]ersonal injury . . . caused by an occurrence . . . .

---

[1] The district court's initial order was unclear as to whether it applied to liability for Elkins's § 1983 claim. The court subsequently clarified that the above analysis applied to this claim as well, because "[t]he constitutional claim at issue here was based on the allegation that Mr. Elkins was detained and prosecuted without probable cause," from which the district court concluded that the language of the RLI policy covered the § 1983 claim and that the § 1983 claim had occurred within RLI's policy period.

The definition of "personal injury" includes "injury, other than bodily injury, arising out of false imprisonment, wrongful eviction, wrongful detention, malicious prosecution, [or] discrimination." "Occurrence" is defined as:

> [W]ith respect to a personal injury, an act or series of acts of the same or similar nature committed during this policy period. Such act or series of acts must constitute an offense included in the definition of the term personal injury in this policy. All loss arising out of such act or series of acts, regardless of the frequency thereof or the number of claimants, shall be deemed to arise out of one offense . . . .

In short, RLI is only responsible for "loss because of" injury "arising out of . . . wrongful detention . . . [or] malicious prosecution." Because there was probable cause to prosecute and detain Elkins until the Mann memorandum came into existence—which occurred after RLI's coverage had expired—actions before the Mann memorandum could not have caused a covered loss under the policy.

Under Ohio law, malicious prosecution requires the "instituting" or "continuing" of prosecution without probable cause. *Trussell v. Gen. Motors Corp.*, 559 N.E.2d 732, 736 (Ohio 1990); *Tourlakis v. Beverage Distributors, Inc.*, No. 81222, 2002 WL 31875970, at *4 (Ohio Ct. App. Dec. 26, 2002). In other words, a defendant can recover for a prosecution that was not malicious at its inception, but only became malicious later, when it continued without probable cause. The key issue is whether there was probable cause, and, for this case, when any probable cause disappeared. The time when probable cause disappeared can also determine when a § 1983 deprivation-of-due-process claim occurs, because continued custody and prosecution without probable cause is a violation of constitutional rights. *See Spurlock v. Satterfield*, 167 F.3d 995, 1006 (6th Cir. 1999).

Here, the Barberton defendants had probable cause until the alleged *Brady* violation, such that the malicious prosecution and the deprivation of due process can only have occurred in

January 1999, after the end of the RLI policy period. The existence of probable cause is often a question for a fact-finder. *Crockett v. Cumberland Coll.*, 316 F.3d 571, 581 (6th Cir. 2003). However, in this case, it is clear that probable cause existed, as a matter of law, all the way until the alleged *Brady* violation. This is because, under Ohio law, "a finding of guilty of a criminal offense . . . even though later and finally reversed by a reviewing court, raises a conclusive presumption of probable cause and constitutes a complete defense in a later action for malicious prosecution." *Vesey v. Connally*, 175 N.E.2d 876, 878 (Ohio Ct. App. 1960); *see also Tilberry v. McIntyre*, 733 N.E.2d 636, 641 (Ohio Ct. App. 1999). This presumption can be rebutted, but only by "fraud or unlawful means in securing a conviction." *Vesey*, 175 N.E.2d at 878. A *Brady* violation such as the one alleged here can constitute such "fraud or unlawful means," *Harris v. Bornhorst*, 513 F.3d 503, 520 (6th Cir. 2008), which is what allowed Elkins to overcome qualified immunity in the underlying suit, *Elkins*, 2009 WL 1150114, at *8-*9. However, all of the other alleged problems with the case against Elkins—the unreliability of a six-year-old's identification, the discrediting of alibi witness testimony, the DNA mismatch—were available to Elkins for his criminal defense, such that they could not have constituted the "fraud or unlawful means in securing a conviction" necessary to rebut probable cause at any time prior to the alleged *Brady* violation.

Neither party contests that this act occurred in January 1999, six months after the end of the RLI policy period on June 29, 1998. Therefore, under the plain language of its policy, RLI is not responsible for the Barberton defendants' liability to Elkins.

To resist this conclusion, Selective argues that there is a "majority rule" that, for insurance purposes, "coverage for a malicious prosecution claim is triggered at the time the underlying criminal charges are filed." Selective's position is that coverage was triggered when

Elkins was first charged on June 10, 1998, during RLI's policy period, regardless of when the prosecution of Elkins lost probable cause and the actual tort of malicious prosecution occurred. Selective cites numerous out-of-circuit federal and state cases holding the insurer at the time charges were filed responsible for liability arising out of a malicious prosecution claim. *See, e.g.*, *Genesis Ins. Co. v. City of Council Bluffs*, 677 F.3d 806 (8th Cir. 2012); *City of Erie, Pa. v. Guar. Nat. Ins. Co.*, 109 F.3d 156 (3d Cir. 1997).

These cases are flatly distinguishable. What Selective cites as the "majority rule" is actually a resolution to an entirely different legal issue. State torts of malicious prosecution generally require "termination of the prosecution in the favor of the accused," *Trussell*, 559 N.E.2d at 736, which insurers have relied on to argue that the tort of malicious prosecution does not occur until a defendant is acquitted or exonerated, which, in some cases, can occur years or decades after charges were initially filed. The cases on which Selective relies most heavily—*Genesis*, 677 F.3d at 812-15 & n. 5 and *City of Erie*, 109 F.3d at 158-60—articulated the "majority rule" in order to reject this argument and hold that coverage was triggered when the malicious prosecution was first initiated and the injury caused by that prosecution was first felt, which, in those cases, was the time that charges were filed.[2] But neither of these cases dealt with a situation like the one here, where the injury—i.e., the filing of charges—occurred *before* any tortious activity, and therefore could not have been caused by the tortious activity. Furthermore, neither of these cases had to apply policy language like the policy language at issue

---

[2] Different courts give different reasons for looking at the time of (tort-caused) injury rather than the time of exoneration. For example, the rule may be due to the fact that "a contrary rule might well enable plaintiffs to lull an unwary insurer into extending coverage after they perceive an impending difficulty from a suit in which they are already engaged," *Royal Indem. Co. v. Werner*, 979 F.2d 1299, 1300 (8th Cir. 1992), or because the prosecution can be thought of as the "essence" of the tort and the favorable termination as merely a "condition precedent to institution of the action," *Muller Fuel Oil Co. v. Ins. Co. of N. Am.*, 232 A.2d 168, 174 (N.Y. App. Div. 1967).

in this case, which made clear that RLI was responsible only for injury "*caused by*" an act or series of acts that constitute an offense and occur within the policy period.

The other cases that Selective cites for the "majority rule" are distinguishable for the same or very similar reasons—in none of these cases did the courts deal with a prosecution that began legitimately and then turned malicious; instead they focused on the question of whether coverage was triggered at the beginning of the prosecution or after exoneration. *See Royal Indem. Co. v. Werner*, 979 F.2d 1299, 1300 (8th Cir. 1992); *Sarsfield v. Great Am. Ins. Co. of New York*, 833 F. Supp. 2d 125, 132 (D. Mass. 2008), *aff'd*, 335 F. App'x 63 (1st Cir. 2009); *N. River Ins. Co. v. Broward Cty. Sheriff's Office*, 428 F. Supp. 2d 1284, 1290-91 (S.D. Fla. 2006); *Ethicon, Inc. v. Aetna Cas. & Sur. Co.*, 688 F. Supp. 119, 124 (S.D.N.Y. 1988) (making clear that "[i]n a criminal or civil prosecution that is malicious *from its inception*, injury begins to flow from the time when the complaint is filed") (emphasis added); *Southern Maryland Agricultural Ass'n, Inc. v. Bituminous Casualty Corp.*, 539 F. Supp. 1295, 1302 (D. Md. 1982); *Billings v. Commerce Ins. Co.*, 936 N.E.2d 408, 412-13 (Mass. 2010); *City of Lee's Summit v. Missouri Pub. Entity Risk Mgmt.*, 390 S.W.3d 214, 220-21 (Mo. Ct. App. 2012); *Newfane v. Gen. Star Nat. Ins. Co.*, 14 A.D.3d 72, 73 (N.Y. App. Div. 2004); *see also Idaho Ctys. Risk Mgmt. Program Underwriters v. Northland Ins. Companies*, 205 P.3d 1220, 1224-28 (Idaho 2009) (holding that "*resulting* injury" or "*resultant* injury" constituted "occurrence").

Selective also argues that even if the district court in Elkins's underlying suit against the Barberton defendants held that the alleged *Brady* violation was enough to destroy probable cause in January 1999, it does not necessarily follow that probable cause was not destroyed earlier, at some time before the RLI policy period ended. Therefore, argues Selective, it should still be able to demonstrate that probable cause evaporated during RLI's policy period, making RLI

responsible. This argument is squarely foreclosed by Ohio's legal presumption of probable cause from a jury conviction, which means that the Barberton defendants must have had probable cause all the way until they allegedly committed "fraud or unlawful means in securing a conviction" by withholding the Mann memorandum. *Vesey*, 175 N.E.2d at 878. Finally, Selective argues that the RLI policy definition of "occurrence" "sweeps into a single occurrence all injuries and damage resulting from one proximate, uninterrupted and continuing cause," such that "where a claim arises out of a series of interrelated wrongful acts, the series of acts shall be considered one act." Selective's argument here focuses on the last sentence of RLI's definition of "occurrence," which provides that "[a]ll loss arising out of such act or series of acts, regardless of the frequency thereof or the number of claimants, shall be deemed to arise out of one offense . . . ." The problem with Selective's interpretation is that it ignores the word "such" in this sentence. This "such" refers back to the "act" or "series of acts" defined in the immediately preceding first and second sentences of the definition of "occurrence." As set forth above, these first and second sentences of the definition provide that an act or series of acts must be "committed during th[e] policy period," and "must constitute an offense included in the definition of the term personal injury in th[e] policy." Therefore, Selective's focus on the third sentence of this definition of occurrence cannot escape the plain meaning of the rest of the definition, defeating Selective's argument.

We need not address RLI's alternative arguments concerning notice and apportionment.

The judgment of the district court is reversed and the case remanded for proceedings consistent with this opinion.