**CHICAGO INSURANCE COMPANY,**
**an Illinois Corporation,**
**Plaintiff,**

v.

The **CITY OF COUNCIL BLUFFS, IOWA, Daniel C. Larsen, in his individual and official capacities, and Lyle W. Brown, in his individual and official capacities, Defendants.**

**Columbia Casualty Company, Plaintiff,**

v.

**City of Council Bluffs, Iowa, Daniel C. Larsen, Lyle W. Brown, David Dawson, Terry Harrington, and Curtis W. McGhee, Jr., Defendants.**

**Nos. 1:07–cv–21 RP–TJS, 1:07–cv–24.**

United States District Court, S.D. Iowa, Western Division.

March 12, 2012.

Bethany K. Culp, Duana Joan Grage, Hinshaw & Culbertson LLP, Minneapolis, MN, Debra Lynne Hulett, Nyemaster Goode PC, Des Moines, IA, Linda J. Carwile, Roderick T. Dunne, Karbal, Cohen,

Economou, Silk & Dunne LLC, Chicago, IL, for Plaintiff.

Michael A. Sciortino, Council Bluffs City Attorneys Office, Council Bluffs, IA, Lorraine J. May, Thomas P. Murphy, Hopkins & Huebner, Alan O. Olson, Olson Law Office PC, Des Moines, IA, Thomas P. Frerichs, Frerichs Law Office Waterloo, IA, Mel C. Orchard, Spence Law Firm LLC, Jackson, WY, Stephen Dillard Davis, Steve Davis Law PC, Oak Brook, IL, William H. Jones, Canel Davis & King, Chicago, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER

ROBERT W. PRATT, District Judge.

Before the Court are two motions for summary judgment. The first motion was filed by Plaintiff Chicago Insurance Co. ("CIC") on May 4, 2011. Clerk's No. 28. The City of Council Bluffs (the "City"), Daniel C. Larsen ("Larsen"), and Lyle W. Brown ("Brown") (collectively "Defendants") filed a response in opposition to CIC's motion on October 25, 2011. Clerk's No. 57. CIC filed a reply on December 23, 2011. Clerk's No. 101–1; *see also* Clerk's No. 112. The second motion was filed by Plaintiff Columbia Casualty Co.

("Columbia") on May 13, 2011. Clerk's No. 29. Defendants[1] filed a response in opposition to Columbia's motion on October 25, 2011. Clerk's No. 59. Curtis McGhee, Jr. ("McGhee")[2] filed a response in opposition to Columbia's motion on November 8, 2011.[3] Clerk's No. 77; *see also* Clerk's Nos. 65–1, 65–2. Columbia filed a reply on December 23, 2011. Clerk's No. 108–1; *see also* Clerk's No. 110. The matters are fully submitted.[4]

## I. FACTUAL & PROCEDURAL BACKGROUND

These cases arise out of two underlying actions filed by McGhee and Terry Harrington ("Harrington") (collectively "Claimants"): *Harrington v. County of Pottawattamie,* Case No. 4:05–cv–178 and *McGhee v. Pottawattamie County,* Case No. 4:05–cv–255 (collectively "the Underlying Actions"). The following facts are undisputed unless otherwise noted.[5]

### A. *The Underlying Actions*

In 1977, Claimants were arrested for the murder of former police officer John Schweer ("Schweer"). Pl. Chicago Ins. Co.'s Statement of Undisputed Facts (hereinafter "CIC Facts") ¶ 1 (Clerk's No.

---

1. David Dawson ("Dawson"), a defendant in the Columbia case, but not in the CIC case, is included in the Court's definition of "Defendants," as that term is used in this opinion.

2. Although McGhee has been named as a defendant by Columbia, he is not a defendant in the CIC case. And, unlike Dawson, McGhee is not a defendant in the Underlying Actions or a party to any of the insurance contracts at issue. Therefore, for analytical clarity, the Court does not include McGhee in the definition of "Defendants," as that term is used in this opinion.

3. McGhee filed an initial response brief on October 27, 2011, *see* Clerk's No. 65; however, the Court considers the later-filed brief to be the operative one.

4. Defendants attempted to file supplemental responses on December 20, 2011; however, those documents have been stricken. *See* Clerk's No. 115.

5. This opinion will, however, only discuss facts that have been properly brought before the Court. For example, Defendants' "Statement[s] of Additional Facts" do not comply with the Local Rules and have not been considered by the Court. *Compare* Clerk's No. 57–1 at 4 *and* Clerk's No. 59–1 at 3 *with* LR 56(b) ("Each individual statement of additional material fact must be concise, numbered separately, and supported by references to those specific pages, paragraphs, or parts of the pleadings, depositions, answers to interrogatories, admissions, exhibits, and affidavits that support the statement, with citations to the appendix ....").

28–1); Columbia Cas. Co.'s Statement of Undisputed Facts (hereinafter "Columbia Facts") ¶ 1 (Clerk's No. 29–2). McGhee was convicted of Schweer's murder on or around May 11, 1978. Clerk's No. 65–1 at 2; *see also* CIC Facts ¶ 2; Columbia Facts ¶ 3. Harrington was convicted of Schweer's murder on August 4, 1978. CIC Facts ¶ 2; Columbia Facts ¶ 2. Claimants were released from prison in 2003. CIC Facts ¶ 3; Columbia Facts ¶ 4.

In 2005, Claimants filed the Underlying Actions. *See* CIC Facts ¶¶ 4–5; Columbia Facts ¶¶ 5–6. The Underlying Actions were consolidated in 2009 and are currently stayed pending the resolution of an interlocutory appeal. *See* Case No. 4:03–cv–90616, Clerk's Nos. 104, 249–50. For the time being, however:

> Harrington still has the following claims pending against Defendants: Counts 1 and 2 (claims against Defendants for violation of 42 U.S.C. § 1983) and Count 3 (claims against Defendants for conspiracy under 42 U.S.C. § 1985(3)). McGhee still has the following claims pending against Defendants: Counts 1 and 5 (claims against Larsen and Brown, in their individual capacities, for violation of 42 U.S.C. § 1983); Count 15 (a claim against Larsen and Brown for conspiracy under 42 U.S.C. § 1985(3)); Count 18 (a claim against the City for

violation of § 1983); and Count 19 (a claim against the City for indemnity).[6] *See* Case No. 4:03–cv–90616, Clerk's No. 224 at 3 (footnotes omitted). Claimants' remaining " § 1983 claims seeking damages for constitutional injuries resulting from their arrests, convictions, and incarcerations are in the nature of malicious prosecution because Plaintiffs essentially allege that their constitutional rights were violated as a result of the wrongful institution of legal process against them." *Id.* at 13.

### B. *Additional Facts Relevant to CIC's Motion*

CIC issued two excess liability policies to the City, specifically: (1) No. 55C–043379, which "was in effect for the period July 1, 1983 to July 1, 1984"; and (2) No. 55C–2060253, which "was in effect for the period July 1, 1984 to July 1, 1985" (collectively the "CIC Policies"). CIC Facts ¶¶ 6, 8–9. The corresponding underlying insurance policies were issued by Admiral Insurance Co. ("Admiral") in policies numbered A 3 CM 3110 and A 84 CM 3982, respectively (collectively the "Admiral Policies"). *See id.* ¶¶ 7–9.

### C. *Additional Facts Relevant to Columbia's Motion*

Columbia issued a number of "Special Excess Liability" policies to the City, spe-

---

**6.** Defendants assert that Count 31 of McGhee's complaint also remains pending in the Underlying Actions. *See* Clerk's No. 57–1 ¶ 5; Clerk's No. 59–1 ¶ 6. The Court does not agree. However, even if Defendants were correct, that would not affect the Court's analysis of the instant motions. In determining whether the insurance policies cover McGhee's claims, the Court must focus on "whether the *facts* alleged 'bring the claim within the liability covered by the policy.'" *Gulf Underwriters Ins. Co. v. City of Council Bluffs*, 755 F.Supp.2d 988, 991 n. 5 (S.D.Iowa 2010) (quoting *Stine Seed Farm, Inc. v. Farm Bureau Mut. Ins. Co.*, 591 N.W.2d 17, 18 (Iowa 1999) and citing *Auto–Owners Ins. Co.,*

*Inc. v. Noyes*, No. 96–cv–61, 1997 WL 33558631, at *5 (N.D.Iowa Jan. 14, 1997)). The facts alleged in Count 31 are substantially identical to the facts alleged in Count 18; the only difference of any note is that these two counts have different titles. *Compare* Case No. 4:05–cv–00255, Clerk's No. 1 ¶¶ 469–72 *with id.* at ¶¶ 392–95. Therefore, because the Court must focus its analysis on the factual allegations and Count 31 does not allege any facts beyond those alleged in Count 18, the presence or absence of Count 31 is immaterial to the resolution of the pending motions. Therefore, to the extent that Defendants have disputed this fact, the dispute is not material.

cifically: (1) No. SXP 358 38 48, "incepting August 8, 1977 and expiring August 8, 1978"; (2) No. SXP 358 38 97, "incepting August 8, 1978 and ending August 8, 1979"; (3) No. SXP 358 39 95, "incepting August 8, 1979 and ending August 8, 1980"; (4) No. SXP 358 42 88, "incepting August 8, 1980 and ending August 8, 1981"; (5) No. SXP 358 40 43, "incepting July 1, 1981 and ending July 1, 1982" (collectively, the "Special Excess Policies"). Columbia Facts ¶¶ 7–11. Columbia also issued a "Commercial Umbrella Liability" insurance policy to the City; specifically, No. UMB 689 1266, "with a policy period beginning July 1, 1982 and ending July 1, 1983" (the "Umbrella Policy"). *Id.* ¶ 14. "The City has requested coverage from Columbia ... under each of the ... Special Excess Policies and the Umbrella Policy." *Id.* ¶ 21.

Each of the Special Excess Policies provides, under the heading "Coverage A–Personal Injury Liability" and "Coverage B–Property Damage Liability," that "[t]he Company will indemnify the insured for ultimate net loss in excess of the retained limit hereinafter stated which the insured shall become legally obligated to pay as damages because of personal injury or property damage to which this policy applies, caused by an occurrence." *E.g.,* Columbia App. 64; *see also* Columbia Facts ¶ 12. The Special Excess Policies define "personal injury" to include "malicious prosecution" and "discrimination." *E.g.,* Columbia App. 67; *see also* Columbia Facts ¶ 13. The Special Excess Policies define "occurrence" as "an accident, including injurious exposure to conditions, which results, during the policy period, in personal injury or property damage neither expected nor intended from the standpoint of the insured." *Id.*

The Umbrella Policy provides:

1. COVERAGE A—EXCESS LIABILITY INDEMNITY

The Company will indemnify the insured for **loss** in excess of the total applicable limits of liability of **underlying insurance** stated in the schedule. The provisions of the **Immediate underlying policy** are, with respect to Coverage A, incorporated as a part of this policy.... In the event the obligation of the underlying insurer(s) either to investigate and defend the insured, or pay the cost of such investigation and defense, ceases solely because of exhaustion of the underlying limits of liability through payment of judgments and settlements, then the company shall with respect to damages otherwise covered under Coverage A, either:

(1) assume the duty of investigating and defending the insured against suits seeking damages, or

(2) if the company elects not to assume the duty described in (1) above, the company will reimburse the insured for reasonable defense costs and such reimbursement shall exclude office expenses of the insured, salaries and expenses of employees of the insured and general retainer fees of counsel retained by the insured.

. . . .

2. COVERAGE B—EXCESS LIABILITY INDEMNITY OVER RETAINED LIMIT

The company will indemnify the insured, with respect to any **occurrence** not covered by **underlying insurance,** or with respect to damages not covered by **underlying insurance** but which result from an **occurrence** covered by **underlying insurance,** for **loss** in excess of the insured's **retained limit** which the insured shall become obligated to pay as damages by reason of liability imposed upon the insured by law or assumed by the insured under any contract because of

**personal injury,**
**property damage, or**
**advertising injury**
to which this coverage applies, caused by an **occurrence.**

Columbia Facts ¶ 16 (citing App. in Supp. of Columbia Cas. Co.'s Mot. for Summ. J. (hereinafter "Columbia App.") at 111 (Clerk's No. 29–3)). The Umbrella Policy defines "personal injury" as including:

(1) bodily injury, shock, mental injury or mental anguish,

(2) false arrest, detention or imprisonment, wrongful entry or eviction or other invasion of private occupancy, malicious prosecution or humiliation; except that maliciously inflicted by, at the direction of, or with the consent of the insured, [and]

...

(4) discrimination because of race, color, sex, religion, national origin, age or handicap....

Columbia Facts ¶ 20 (citing Columbia App. at 127–28). The Umbrella Policy defines "occurrence" as follows:

(1) with respect to subsection (1) of the definition of personal injury and with respect to property damage, an accident, including continuous or repeated exposure to conditions, which results, during this policy period, in such personal injury or property damage neither expected nor intended from the standpoint of the insured. All loss arising out of continuous or repeated exposure to substantially the same conditions shall be considered as arising out of one occurrence.

(2) with respect to subsections (2), (3) and (4) of the definition of personal injury, an act or series of acts of the same or similar nature, committed during this policy period which causes such personal injury. All loss arising out of such act or series of acts, regardless of the frequency thereof or the number of claim-

ants, shall be deemed to arise out of one occurrence....

*Id.* ¶ 19 (citing Columbia App. at 127–28).

## II. STANDARD FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Summary judgment can be entered against a party if that party fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is appropriately granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and that the moving party is therefore entitled to judgment as a matter of law. *Harlston v. McDonnell Douglas Corp.,* 37 F.3d 379, 382 (8th Cir. 1994). The Court does not weigh the evidence, nor does it make credibility determinations. The Court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Wilson v. Myers,* 823 F.2d 253, 256 (8th Cir.1987) ("Summary judgment is not designed to weed out dubious claims, but to eliminate those claims with no basis in material fact.") (citing *Weight Watchers of Quebec, Ltd. v. Weight Watchers Int'l, Inc.,* 398 F.Supp. 1047, 1055 (E.D.N.Y.1975)).

In a summary judgment motion, the moving party bears the initial burden of demonstrating the absence of a genuine

issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. If the moving party has carried its burden, the nonmoving party must then go beyond its original pleadings and designate specific facts showing that there remains a genuine issue of material fact that needs to be resolved by a trial. *See Commercial Union Ins. Co. v. Schmidt*, 967 F.2d 270, 271 (8th Cir.1992); *see also* Fed.R.Civ.P. 56(c). This additional showing can be by affidavits, depositions, answers to interrogatories, or the admissions on file. *See Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505. An issue is "genuine" if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *See id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material.... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

### III. LAW AND ANALYSIS

The parties all cite Iowa cases for the governing substantive law. *See* Pl. Chicago Ins. Co.'s Mem. of Law in Supp. of its Mot. for Summ. J. (hereinafter "CIC Br.") at 8 (Clerk's No. 28–2) (referring to "applicable Iowa law"); Columbia Cas. Co.'s Mem. in Supp. of its Mot. for Summ. J. (hereinafter "Columbia Br.") at 9 (Clerk's No. 29–1) (adopting "the law and argument stated in" CIC's brief); Defs.' Mem. of Law in Resistance to Mot. for Summ. J. of Chicago Ins. Co. (hereinafter "Defs.' Resp. to CIC") at 4–5 (Clerk's No. 66) (referring to Iowa law and noting that the relevant poli-

cies "were issued in Iowa to an Iowa municipality"); Defs.' Mem. of Law in Resistance to Mot. for Summ. J. of Columbia Ins. Co. (hereinafter "Defs.' Resp. to Columbia") at 5 (Clerk's No. 67) (asserting that "Iowa substantive law governs the determination of the insurance contractual rights" in this case); McGhee's Revised Resistance to Columbia Cas. Co.'s Mot. for Summ. J. (hereinafter "McGhee Br.") at 4 (Clerk's No. 77) (assuming, without discussion, that Iowa law applies). The Court sees no reason why Iowa law would not be controlling; therefore, the Court will apply Iowa law to its analysis of all of the applicable insurance policies.

 Under Iowa law, "[t]he burden of proof rests on the insured to prove a claim is covered by the terms of a policy." *Schwartz v. N.Y. Life Ins. Co.*, No. 3:01–cv–10084, 2003 WL 25275947, at \*3 (S.D.Iowa Feb. 5, 2003) (slip copy) (citing *Messer v. Wash. Nat'l Ins. Co.*, 233 Iowa 1372, 11 N.W.2d 727, 730 (1943)). Therefore, for each policy at issue, Defendants have the initial burden of showing that the Underlying Actions are "comprehended by the policy's general coverage provisions." *See Modern Equip. Co. v. Cont'l W. Ins. Co., Inc.*, 355 F.3d 1125, 1128 (8th Cir. 2004) (quoting *A.Y. McDonald Indus., Inc. v. Ins. Co. of N. Am.*, 842 F.Supp. 1166, 1171 (N.D.Iowa 1993)). If Defendants meet this burden, then the insurers must prove the "applicability of any exclusion which allegedly precludes coverage." *Id.* (quoting *A.Y. McDonald*, 842 F.Supp. at 1171).

[I]f after construing both the policy in question, the pleadings of the injured party and any other admissible and relevant facts in the record, it appears the claim made is not covered by the indemnity insurance contract issued, the insurer has no duty to ... indemnify. If such be the case, the words and phrases of the policy should not be strained to

impose liability that was not intended and not purchased.

*Id.*

### A. *Issues Common to Both Motions*

### 1. *Appropriate "trigger."*

All of the insurance policies at issue in these cases are "occurrence" policies. These types of policies "provide[ ] coverage for any acts or omissions that arise during the policy period," unlike "claims made" policies, which "provide[ ] coverage for any errors, including those made before the effective date of the policy, as long as a claim is made within the policy period." *Hasbrouck v. St. Paul Fire & Marine Ins. Co.*, 511 N.W.2d 364, 366 (Iowa 1993). Under an occurrence policy, "[t]he time of 'occurrence' is when the claimant sustains damages, not when the act or omission causing the damage takes place." *Tacker v. Am. Family Mut. Ins. Co.*, 530 N.W.2d 674, 676 (Iowa 1995). Neither side disputes this basic proposition; however, they disagree about when the damage alleged in the Underlying Action was sustained.

In other words, the parties dispute the appropriate trigger of coverage. *See generally Quincy Mut. Fire Ins. Co. v. Borough of Bellmawr*, 172 N.J. 409, 799 A.2d 499, 503 (2002) ("[W]hen an insured has been covered by several policies over the relevant period of time, identifying the appropriate trigger of coverage, or when an occurrence took place, will be critical in determining which insurer is liable for the damages that have accrued."). As one commentator has explained:

"Trigger of coverage" refers to the legal test used to determine which policy should be looked at to ascertain if that policy has coverage obligations regarding the claims asserted against the policyholder. As so conceptualized, the trigger concept is not designed to determine coverage; rather, it acts as a gatekeeper, matching particular claims with particular periods of time and hence particular insurance policies.

James M. Fischer, *Insurance Coverage for Mass Exposure Tort Claims: The Debate Over the Appropriate Trigger Rule*, 45 DRAKE L.REV. 625, 631 (1997) (hereinafter "Fischer"). Thus, the real issue raised by the parties is not how a particular policy's terms should be applied; rather, it is how the Court should decide which policy (or policies) should be applied. *See id.* (noting that "[t]he term 'trigger' does not appear in policy language," but is, rather "a legal test"); *see also Polarome Int'l, Inc. v. Greenwich Ins. Co.*, 404 N.J.Super. 241, 961 A.2d 29 (2008) ("[T]he continuous-trigger theory does not arise from the plain language of [commercial general liability] policies." (internal quotation marks omitted)).

Defendants and McGhee [7] urge the Court to adopt a "continuous trigger approach in cases of malicious prosecution." Defs.' Resp. to CIC at 12; *see also* McGhee Br. at 3–8. "The 'continuous' or 'multiple' trigger theory ... holds that coverage is triggered many times (or throughout) the relevant period from exposure [to something causing an injury] through manifestation [of that injury], resulting in all insurance policies in effect during the relevant time periods having a duty to cover some portion of the loss." 7 COUCH ON INSURANCE § 102:22 (3d ed.) (hereinafter "COUCH") (footnote omitted).

---

**7.** The Court notes that although McGhee has made arguments regarding CIC's policies in his brief, *see* Clerk's No. 77, McGhee is not a party to the CIC case. Therefore, the Court has not considered McGhee's arguments in its resolution of the issues that are unique to CIC's motion. However, because Columbia "adopts the law and argument stated in" CIC's brief, the Court will consider McGhee's responses to those arguments insofar as they are relevant to issues that are common to both motions.

"The continuous trigger theory has its origins in *Keene Corp. v. Insurance Co. of North America,* [a case] involving asbestos-related diseases." [8] *Fischer* at 650 (citing 667 F.2d 1034 (D.C.Cir.1981)). In *Keene,* the relevant policies stated that:

> [T]he company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury ... to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury ... even if any of the allegations of the suit are groundless, false or fraudulent. ...

667 F.2d at 1039 (omissions in original). " 'Bodily injury' [was] defined as 'bodily injury, sickness or disease sustained by any person,'; and 'occurrence' [was] defined as 'an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury ... neither expected nor intended from the standpoint of the insured.' " *Id.* (internal citation omitted, omission in original). In analyzing whether the policies covered the claims for asbestos-related injuries, the court first observed that "[t]he language of each policy at issue in this case clearly provides that an 'injury,' and not the 'occurrence' that causes the injury, must fall within a policy period for it to be covered by the policy." *Id.* at 1040. However, the court ruled that the "terms of the polices" did not "lead ... directly to a resolution of the coverage issues raised" by the case.[9] *Id.* at 1041. Rather, the court focused on the unique nature of asbestos-related disease, stating:

> Most suits brought under this type of policy involve an injury and an occurrence that transpired simultaneously, or, at least, in close temporal proximity to one another. In cases involving asbestos-related disease, however, inhalation—the "occurrence" that causes the injury—takes place substantially before the manifestation of the ultimate injury—asbestosis, mesothelioma, or lung cancer. Furthermore, although it is not known how little exposure is required to cause disease, inhalation may occur over a long period of time. As a result, inhalation may continue through numerous policy periods, the disease may develop during subsequent policy periods, and manifestation may occur in yet another policy period.

*Id.* at 1040 (footnote omitted). Thus, according to the court, "[a]sbestos-related diseases, which are certainly covered by the policies, therefore differ from most injuries and hence present a difficult problem of contractual interpretation." *Id.* The court's solution to this problem was to hold "each insurer on the risk between the initial exposure and the manifestation of disease ... liable to Keene for indemnification and defense costs." [10] *See id.* at 1041.

"Subsequent to the decision in *Keene* ..., many jurisdictions have applied the

---

8. The Court notes that *Keene* antedates some of the policies at issue in these cases. But even for the policies that post-date *Keene,* there is no indication in the record that, at the time of contracting, the City—or any other reasonable insured—believed that the approach used in *Keene* would be applied to claims of malicious prosecution.

9. Thus, the *Keene* court implicitly rejected the "plain text" argument made by Defendants and McGhee.

10. Commentators have suggested that, in *Keene,* the court adopted its "continuous trigger" approach—also known as "the 'continuous injury' approach"—in order "to maximize the potential for each victim to secure meaningful compensation for his or her injuries." *See* Mark C. Rahdert, *Reasonable Expectations*

continuous trigger theory in both asbestos and environmental contamination cases." *Quincy*, 799 A.2d at 504 (citing cases). CIC and Columbia, on the other hand, argue that the Court should use the manifestation theory it used in another case involving questions of insurance coverage for the Underlying Actions. *See* CIC Br. at 2–3 (referring to *Gulf Underwriters Ins. Co. v. City of Council Bluffs*, 755 F.Supp.2d 988 (S.D.Iowa 2010)); Columbia Br. at 3 (same). The Court will consider the parties' arguments in turn.

Defendants argue that the Court should follow the reasoning in *National Casualty Insurance Co. v. City of Mount Vernon*, a 1987 case from a New York intermediate appellate court. Defs.' Resp. to CIC at 11 (citing 128 A.D.2d 332, 515 N.Y.S.2d 267 (2d Dept.1987)). In *National Casualty*, the claimant sought damages for, *inter alia*, false arrest and false imprisonment. 515 N.Y.S.2d at 268. The insurer argued that "as defined by the policy, the term 'occurrence' must be interpreted to refer to the precipitating event giving rise to the injury sustained." *Id.* at 270. The court did not agree, concluding that the "damage resulting from false imprisonment represents a category of covered personal injury as defined in the policy and that such damage was allegedly sustained, at least in part, when the policy was in force." 515 N.Y.S.2d at 270–71. The court based this conclusion on the language of the policy, reasoning that:

> [T]here is nothing in the policy which requires, as a prerequisite to ascertaining whether there is coverage, that the injury resulting from a causative event be reduced to a single or fixed occurrence in time. Nor does the policy distinguish, in terms of coverage, between compensable injuries which are continuous in nature and those whose occurrence is discrete and noncontinuous or require that a personal injury take place in its entirety during the policy period. *These omissions are particularly significant in that the policy specifically recognizes that an injury can be caused by "continuous or repeated exposure to conditions"* (cf. *Keene Corp. v. Insurance Co. of North Amer.*, 667 F.2d 1034, 1049, cert. denied 455 U.S. 1007, 102 S.Ct. 1644, 1645, 71 L.Ed.2d 875).

*Id.* at 270 (emphasis added). Notably, the claimant in *National Casualty* did not seek to recover damages for malicious prosecution; indeed, the court specifically distinguished the injuries sustained as a result of false imprisonment from those sustained as a result of malicious prosecution. *See id.* at 271 ("National's reliance upon decisions from other jurisdictions involving the tort of malicious prosecution is misplaced.").

Defendants argue that the Court should follow *National Casualty* for two reasons. First, Defendants argue that "it is consistent with the policy language" in this case. *See* Defs.' Resp. to CIC at 11; Defs.' Resp. to Columbia at 14. The Court does not agree. None of the relevant policy provisions in these cases contain the "continuous or repeated exposure to conditions" language that was at issue in—and important to the resolution of—*National Casualty*.[11] *See* 515 N.Y.S.2d at 268 (noting

---

*Revisited*, 5 Conn. Ins. L.J. 107, 143 (Fall 1998) (emphasis omitted). Perhaps unsurprisingly, then, *"Keene* has been criticized as overbroad and unduly result-oriented." *See id.* at 144 (citing, *inter alia*, *Abex Corp. v. Md. Cas. Co.*, 790 F.2d 119, 126 (D.C.Cir.1986) and *Owens–Illinois, Inc. v. United Ins. Co.*, 138 N.J. 437, 650 A.2d 974, 985 (1994)).

Moreover, neither Defendants nor McGhee have cited—nor is the Court aware of—any cases indicating that maximization of coverage is, in and of itself, a policy goal under Iowa law.

**11.** Although both the Special Excess Policies and the CIC Policies define "occurrence" to

that the policy at issue defined "occurrence," in relevant part, as "an event, *including continuous or repeated exposure to conditions,* which results in PERSONAL INJURY, BODILY INJURY or PROPERTY DAMAGE sustained, during the policy period" (emphasis added)); *see also id.* at 270 (supporting the conclusion that the policy covered the false imprisonment claim by citation to the "continuous or repeated exposure to conditions" language in the definition of "occurrence"). Second, Defendants argue that their approach "provides all parties better opportunity to manage their risk." Defs.' Resp. to CIC at 11; Defs.' Resp. to Columbia at 14. Specifically, Defendants argue that:

Application of the continuous trigger approach to coverage in cases of malicious prosecution permits municipalities to respond to changing law and risks over decades of times [sic] that such claims often entail, to permit insurers to charge premiums commensurate with the risks taken and to sync the coverage with the conduct and the existence of the injury in these unique cases when the existence of the damage can end based upon the conduct of the insured.

Defs.' Resp. to CIC at 12. The Court does not agree. None of these arguments—at least insofar as the Court is able to understand them—support the application of the continuous trigger approach, in this case or in general. Indeed, Defendants' point about insurers' ability "to charge premiums commensurate with the risks taken," would seem to counsel *against* the applica-

tion of the continuous trigger approach. Indeed, as another court noted in its analysis of a similar case, "it is inconceivable that the calculation of the premium that [the insured] paid [the insurer] in order to purchase the Policy included an analysis of any earlier prosecutions in [the insured's] County and the likelihood of malfeasance over the course of those prosecutions." *N. River Ins. Co. v. Broward Cnty. Sheriff's Office,* 428 F.Supp.2d 1284, 1290 (S.D.Fla. 2006).

McGhee argues that "[i]n Iowa, an injury that continues over multiple policy periods triggers coverage under every occurrence policy in effect while the injury is in progress." McGhee Br. at 4 (citing, *inter alia, Interstate Power Co. v. Ins. Co. of N. Am.,* 603 N.W.2d 751, 755–56 (Iowa 1999)).[12] However, *Interstate Power* does not support this broad proposition. In *Interstate Power,* the insured sought insurance coverage "for environmental cleanup costs at several [manufacturing plant] locations." 603 N.W.2d at 753. The insured "contend[ed] that the exposure of the coal tar, coke, and other residual solids from the manufacturing operations to natural precipitation" triggered coverage under policies issued by the insurer. *Id.* at 753. The language in one of those policies provided:

With respect to [the coverage for property damage], "occurrence" means either an accident happening during the policy period or a continuous or repeated exposure to conditions which unexpectedly and unintentionally causes in-

---

include "injurious exposure to conditions," they do not use the specific language—i.e., "*continuous or repeated* exposure to conditions"—that was so important to the resolution of *National Casualty. Compare* Columbia Facts ¶ 13 *and* CIC App. at 16 *with* 515 N.Y.S.2d at 270.

**12.** McGhee also cites *General Casualty Insurance Co. of Wisconsin v. Penn–Co Construc-*

*tion, Inc.,* No. 03–cv–2031, 2005 WL 503927, at *15 (N.D.Iowa Mar. 2, 2005). *See* McGhee Br. at 4. However, *Penn–Co* is neither binding authority nor particularly persuasive. In *Penn–Co,* the Court dealt with an entirely different type of injury—namely, property damage caused by roof leaks. *See* 2005 WL 503927, at *15.

jury to or destruction of property during the policy period. All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

*Id.* at 755 (emphasis omitted). The district court ruled that there was no "occurrence" under this policy because "the coal tar and other solid residues that were the basis of the contamination had been placed on or in the ground many years before these insurance policies went into effect." *Id.* The Iowa Supreme Court reversed, based on the "continuous or repeated exposure to conditions" language. *Id.* The Iowa Supreme Court reasoned that:

> There is nothing in the policy language that requires *the repeated exposure to conditions* to have occurred during the time that Interstate was operating the manufacturing plants. All that is necessary is that the repeated exposure to conditions cause some damage during the policy period. And *this is amplified by the additional language providing* "[a]ll damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence."

*Id.* (alteration in original) (emphasis added). Thus, the Iowa Supreme Court based its decision on the specific definition of "occurrence"—a definition that does not appear in any of the policies in this case. Importantly, the Iowa Supreme Court never stated—let alone held—that "an injury that continues over multiple policy periods triggers coverage under every occurrence

policy in effect while the injury is in progress." Compare *id.* with McGhee Br. at 4.

McGhee also suggests that this case is analogous to environmental pollution cases like *Interstate Power,* arguing that Claimants' injuries were both "latent" and "progressive." *See* McGhee Br. at 5. Specifically, McGhee argues that Claimants' injuries were: (1) "latent" because there was no "covered loss" until Claimants' convictions were overturned; and (2) "progressive" because Claimants' potential damages increased each year they were imprisoned. *See id.* at 5–6. The Court does not agree. Although it is true that Claimants did not have a *cause of action* for malicious prosecution—and thus, could not sue for any "covered losses"—until after their convictions were overturned, that does not mean that their injuries were "latent." Unlike the victims of ground contamination, Claimants were aware they had been injured at the time of their injury-in-fact—i.e., at the time of their convictions. And although Claimants' potential *damages* increased each year they were in jail, the actual *injury*—i.e., being convicted for a crime they did not commit—did not change over the years. Therefore, their injuries are not "progressive" in the sense that term is used in cases that have adopted a continuous trigger theory.[13]

■ After careful consideration of all of the case law cited by the parties, the Court finds *Coregis Insurance Company v. City of Harrisburg* to be particularly persuasive. The insurance policies at issue in

---

13. The Court also notes that, even if Claimants' injuries were deemed to be "progressive" in the sense that the " 'damage' or 'injury' [was] not complete when it [did] become manifest, but continue[d], or even worsen[ened], after that point," that would not change the Court's conclusion. *See generally* Couch § 102:23 (observing that, in such situations, "courts have generally taken the posi-

tion that coverage is triggered when the harm first manifests, and the insurer on the risk at the time of first manifestation is liable for the entire loss, even if the damage progresses after the policy expires") (citing, *inter alia, Royal Indem. Co. v. Werner,* 784 F.Supp. 690 (E.D.Mo.1992), *aff'd,* 979 F.2d 1299 (8th Cir. 1992)).

*Coregis,* like the policies at issue here, provided coverage for damages that the insured became obligated to pay as damages for injuries that occurred during the policy periods. *See* No. 1:03–cv–920, 2006 WL 860710, at \*2–3 (M.D.Pa. Mar. 30, 2006). In *Coregis,* as in the Underlying Cases, "the entire thrust of [each] underlying complaint focuses on the alleged actions and malfeasance of law enforcement officials perpetrated before and during [the claimant's] ... criminal trials in the 1970s that resulted in [the claimant's] conviction for ... murder." *See id.* at \*10. In that case, the court concluded that the claimant's injuries occurred, for insurance purposes, at the time they first became manifest. *See id.* at \*10–11. The Court agrees. The Court also notes that "[t]he rationale underlying application of the 'continuous trigger' theory in the insurance coverage context makes clear that it is not well-suited to a situation, where, as here, any injury was evident from the outset and first occurred prior to the inception of insurance coverage." *See Sarsfield v. Great Am. Ins. Co. of N.Y.,* No. 07–cv–11026, 833 F.Supp.2d 125, 131, 2008 WL 8587054, at \*5 (D.Mass. June 3, 2008) (refusing to adopt a continuous trigger theory in an analogous case); *see also Keene,* 667 F.2d at 1040 (specifically distinguishing cases where "an injury and an occurrence ... transpired simultaneously, or, at least, in close temporal proximity to one another").

The Court "concludes that where, as here, it is not 'difficult to ascertain when the injurious effects of the tortious conduct first become manifest ... [i]t is clearer, simpler, and fairer to define the time of the occurrence as the time the injurious effects first became apparent....'" *Gulf Underwriters,* 755 F.Supp.2d at 1005–07 (quoting *Billings v. Commerce Ins. Co.,* 458 Mass. 194, 936 N.E.2d 408, 413 (2010)) (omission and alteration in original); *see also Idaho Cnties. Risk Mgmt. Program*

*Underwriters v. Northland Ins. Cos.,* 147 Idaho 84, 205 P.3d 1220, 1226–28 (2009) ("The policy also makes clear that an occurrence requires a resultant injury, so we consider the time of an occurrence as being when the injurious effect first manifests itself."); *City of Erie, Pa. v. Guaranty Nat'l Ins. Co.,* 109 F.3d 156, 164–65 (3d Cir.1997) (rejecting a "multiple trigger" approach to the determination of insurance coverage for malicious prosecution claims); *Northfield Ins. Co. v. City of Waukegan,* 761 F.Supp.2d 766, 773–74 (N.D.Ill.2010) (refusing to apply the continuous trigger theory to insurance claims for a § 1983 case "seeking damages related to [the claimant's] wrongful conviction and imprisonment"); *N. River Ins. Co.,* 428 F.Supp.2d at 1290 (refusing to adopt a continuous trigger theory in an analogous case and noting that it "would strain logic to hold that a policy could be applied retroactively to activities taken twenty years" before the policy's inception).

### 2. *Use of extrinsic evidence.*

Defendants and McGhee both attempt to introduce extrinsic evidence to support their coverage arguments. *See* Defs.' Resp. to CIC at 13; Defs.' Resp. to Columbia at 7–8; McGhee Br. at 6–8. Defendants assert that "[u]nder Iowa law, factual issues such as 'course of performance, course of dealing, or usage of trade' are relevant to the interpretation of the policies and the existence of coverage and can even serve to change the 'plain meaning' of a contract when appropriate." Defs.' Resp. to CIC at 13 (quoting *Pillsbury Co. v. Wells Dairy, Inc.,* 752 N.W.2d 430 (Iowa 2008)); Defs.' Resp. to Columbia at 7–8 (making the same argument). The Court does not agree. As an initial matter, *Pillsbury* does not support Defendants' broad contention that extrinsic evidence is "relevant to ... the existence of coverage" in some general way. Rather, in *Pillsbury,*

the Iowa Supreme Court merely stated that it would "allow extrinsic evidence to aid in the process of *interpretation*." 752 N.W.2d at 436.

■■■ Interpretation is not the same as construction. "Interpretation involves ascertaining the meaning of contractual words; construction refers to deciding their legal effect." *Peak v. Adams,* 799 N.W.2d 535, 543 (Iowa 2011) (quoting *Fashion Fabrics of Iowa, Inc. v. Retail Investors Corp.,* 266 N.W.2d 22, 25 (Iowa 1978)). Under Iowa law,

> Construction of an insurance policy, i.e., the process of determining its legal effect, is always a matter of law for the court. The "interpretation" of language, i.e., the process of determining the meaning of the words used, is also a matter for the court to decide as a matter of law unless it depends on extrinsic evidence or a choice among reasonable inferences to be drawn from it.

*Kalell v. Mut. Fire & Auto. Ins. Co.,* 471 N.W.2d 865, 866–67 (Iowa 1991) (citing *Farm Bureau Mut. Ins. Co. v. Sandbulte,* 302 N.W.2d 104, 107–08 (Iowa 1981)).

Defendants argue that their extrinsic evidence shows that "coverage was intended." Defs.' Resp. to CIC at 13. This is an argument about the intended legal effect of the policies, not an argument about the intended meaning of any policy terms. Therefore, Defendants seek to introduce extrinsic evidence on the issue of construction, not interpretation. Accordingly, *Pillsbury*—which dealt entirely with issues of interpretation—is inapposite. *See* 752 N.W.2d at 435 ("In deciding the issues before us, we are required to apply the principles of contract interpretation, rather than contract construction.").

■■■ "In the construction of insurance policies, the cardinal principle is that the

intent of the parties must control; and *except in cases of ambiguity this is determined by what the policy itself says*." *Nationwide Agri–Business Ins. Co. v. Goodwin,* 782 N.W.2d 465, 470 (Iowa 2010) (quoting *A.Y. McDonald Indus., Inc. v. Ins. Co. of N. Am.,* 475 N.W.2d 607, 618 (Iowa 1991) (internal quotation marks omitted) (emphasis added)). Therefore, the Court cannot agree with the Defendants' suggestion that they (and, by necessary implication, McGhee) have *carte blanche* to use extrinsic evidence in support of their coverage arguments. Instead, Defendants or McGhee must first identify an ambiguity. *See Nationwide,* 782 N.W.2d at 470. Neither Defendants nor McGhee have done so. Therefore, their reliance on extrinsic evidence is improper and the Court has not considered their proffered extrinsic evidence.

### B. *CIC's Motion*

As discussed above, Defendants bear the initial burden of proving that the claims in the Underlying Actions are "comprehended by the [CIC Policies'] general coverage provisions." *See Modern Equip. Co.,* 355 F.3d at 1128. CIC argues that Defendants cannot meet this burden for various reasons. *See* Pl. Chicago Ins. Co.'s Mot. for Summ. J. (hereinafter "CIC Mot.") at 2 (Clerk's No. 28); CIC Br. at 9–13. The Court will discuss these arguments in turn.

CIC argues that the CIC Policies "exclude liability for any injury or damage resulting from the actions of law enforcement personnel except to the extent coverage is provided for this exposure by the Admiral [Policies]." CIC Br. at 5; *see also id.* at 9. In support of this argument, CIC cites Endorsement No. 6 to the CIC Policies. *See id.* at 5–6. Endorsement No. 6, entitled "Police Professional Liability—Following Form," [14] provides:

---

**14.** In the CIC Policies, the endorsement titles are written in all capital letters. The Court has changed the capitalization for greater readability.

It is agreed that, except insofar as coverage is available to the Insured in the underlying insurance, this policy shall not apply to Personal Injury or Property Damage caused by Negligent Acts, Errors and/or Omissions of Police Officers including but not limited to; false arrest, erroneous service of civil papers, false imprisonment, malicious prosecution, assault and battery, libel, slander, defamation of character, violation of property rights. or deprivation of any rights, privileges or immunities secured by the Constitution and the laws of the United States.

App. in Supp. of Pl. Chicago Ins. Co.'s Mot. for Summ. J. (hereinafter "CIC App.") at 25, 45 (Clerk's No. 28–3). In response, Defendants argue that there "is no [such] exclusion" for, essentially, two reasons.[15] *See* Defs.' Resp. to CIC at 18–19.

■ First, Defendants argue that there is "[n]o exclusion for police conduct ... listed" in "the section entitled 'EXCLUSIONS.'" *Id.* at 19 (citing CIC App. at 16–17, 36–37 [16]). Defendants also compare Endorsement No. 6 to Endorsement No. 3, the "Airport Exclusion Endorsement," arguing that in Endorsement No. 3, "[t]he notification is in all capital letters and is clearly identified as an exclusion on a separate line." *Id.* (citing CIC App. at 22, 42). However, Defendants have failed to cite—and the Court is not aware of—any authority that supports their suggestion that, in order to be valid, an exclusion must include the word "exclusion" in the heading or on a separate line.[17] *See id.* at 18–19.

Second, Defendants argue that Endorsement No. 6 does not contain an effective endorsement because:

> [A]s noted in the authorities cited above, the terms of the policy must be given their ordinary meaning as understood by a lay person. To "endorse" something is to "express approval" of it. Webster's Ninth New Collegiate Dictionary. The Thesaurus in Microsoft Word identified the following as synonyms for "endorsement": authorization, commendation, validation, confirmation. NONE of those terms note the use of the word "endorsement" itself would give any ordinary insured even a HINT that there is an "exclusion" from coverage in the document.
>
> Having granted coverage in broad terms, it is the obligation of CIC to express any limitations on that coverage in clear and specific terms. *A.Y. McDonald Indus., Inc. v. Ins. Co. of N. Am.,* 475 N.W.2d 607, 619 (Iowa 1991). It did not. [Endorsement No. 6] cannot therefore be used to limit coverage to the ... Defendants.

Defs.' Resp. to CIC at 19. This argument is unpersuasive. While it is true that an insurer must "clearly and explicitly define any limitations or exclusions to coverage," *see A.Y. McDonald,* 475 N.W.2d at 619, the exclusionary language in Endorsement No. 6 *is* clear and explicit. *See* CIC App. at 25, 45 ("It is agreed that, except insofar as coverage is available to the Insured in the underlying insurance, *this policy shall not apply* to Personal Injury or Property

---

**15.** Notably, Defendants do *not* argue that Claimants' claims pertain to something other than "Personal Injury or Property Damage caused by Negligent Acts, Errors and/or Omissions of Police Officers." *See* Defs.' Resp. to CIC at 18–19.

**16.** For the latter page range, Defendants' actual cite is "CIC 36–27"; however, the Court

assumes they meant to cites pages 36–37 of CIC's appendix.

**17.** Although Defendants make a passing reference to "authorities cited above," Defendants provide no indication of which specific "authorities" they are referring to. *See* Defs.' Resp. to CIC at 18.

Damage caused by Negligent Acts, Errors and/or Omissions of Police Officers . . . ." (emphasis added)). The mere fact that the word "endorsement" appears at the top of the page does not change this fact. Indeed, in Endorsement No. 6, the word "endorsement" appears in a different font than—and is not aligned with—the rest of the text. CIC App. at 22.

For all of these reasons, the Court concludes that Endorsement No. 6 contains a valid exclusion. Therefore, the CIC Policies provide coverage for Claimants' malicious prosecution and discrimination claims only to the extent that such claims are covered by the underlying Admiral Policies.[18] *See* CIC App. at 25, 45. Thus, the Court turns to the issue of whether the Underlying Actions are covered by the Admiral Policies. *See* CIC App. at 25 (excluding coverage "except insofar as coverage is available to the Insured in the underlying insurance"); *see also* CIC Br. at 9 (acknowledging that the CIC Policies "could apply" if the injuries were covered under the Admiral Policies).

CIC argues that Defendants cannot prove that the claims in the Underlying Actions are covered by the Admiral Policies because there was no "occurrence" during either of the policy periods. *See* CIC Br. at 9. The Admiral Policies provides that Admiral:

[W]ill indemnify the Insured for ultimate net loss in excess of the retained limit hereinafter stated which the Insured shall become legally obligated to pay by reason of liability imposed by law, or liability assumed by contract, insofar as the Named Insured may legally do so, for damages because of:
COVERAGE A—BODILY INJURY LIABILITY
COVERAGE B—PROPERTY DAMAGE LIABILITY
COVERAGE C—ERRORS AND OMISSIONS LIABILITY
COVERAGE D—PERSONAL INJURY LIABILITY
COVERAGE E—INDEMNIFICATION FOR CLAIMS ADMINISTRATION ERRORS AND OMISSIONS
to which this policy applies, caused by an occurrence, during the policy period.

CIC App. at 66, 85. The parties do not dispute that COVERAGE D, for personal injury liability, is the relevant coverage provision in this case. *See* CIC Br. at 6–7 (discussing COVERAGE D); Defs.' Resp. to CIC at 20 (same).

The Admiral Policies define "occurrence," for the purposes of COVERAGE D, as "any injury or damage sustained during the policy term, by any person or organization and arising out of the personal injury as defined herein." CIC App. at 71, 90. The Admiral Policies define "personal injury" to include "malicious prosecution" and "discrimination." *Id.* at 71–72, 90. Therefore, in order to meet their initial burden, Defendants must prove that Claimants sustained "any injury or damage sustained during the policy term, by any person or organization and arising out of" malicious prosecution or discrimination.[19] *See id.; see also* Case No. 4:03–cv–

---

18. Therefore, the Court need not consider the parties' arguments that are based on the terms of the CIC Policies themselves. *See* CIC Br. at 11–13 (arguing that the claims do not cover "occurrences" during the policy periods, under the terms of the CIC Policies); *see also* Defs.' Resp. to CIC at 7 (arguing that "[i]n language mirroring that of the CIC policies, the Iowa [Supreme] Court has held that 'All that is necessary is that the repeated exposure to conditions cause some damage during the policy.' ") (quoting *Interstate Power,* 603 N.W.2d at 755 (emphasis omitted)); *id.* at 8–10 (making arguments based on "exposure to conditions" language that is found in the CIC Policies themselves); *id.* at 17–18 (same); *id.* at 23–27 (same).

19. CIC asserts that Defendants also must show that the "injury . . . was neither expected nor intended by the insured." CIC Br. at 7. However, this assertion is contrary to the

90616, Clerk's No. 224 at 3 (listing the claims that remain in the Underlying Actions).

Defendants argue "that the language of the [Admiral Policies] are, at a minimum, ambiguous with regard to the time of the required injury or damage and the ambiguity must be resolved in favor of ... Defendants to grant coverage to them in the instant case."[20] Defs.' Resp. to CIC at 22 (citing *A.Y. McDonald Indus. Inc.*, 475 N.W.2d at 619; *LeMars Mut. Ins. Co. v. Joffer*, 574 N.W.2d 303, 307 (Iowa 1998); and *Westfield Ins. v. Econ. Fire & Cas.*, 623 N.W.2d 871, 875–76 (Iowa 2001)). This argument fails for at least two reasons. First, Defendants have failed to identify any actual ambiguity in the Admiral Policies—i.e., they have not identified any policy language that "is susceptible to two *reasonable* interpretations." *See Nationwide*, 782 N.W.2d at 470; *see also Joffer*, 574 N.W.2d at 307 ("An ambiguity exists if, after the application of pertinent rules of interpretation to the policy, a genuine uncertainty results as to which one of two or more meanings is the proper one." (quoting *A.Y. McDonald*, 475 N.W.2d at 618) (internal quotation marks omitted)). The fact that the parties disagree about how the policy language should be applied to the facts of this case does not, as Defendants suggest, establish ambiguity. *Cf. Bituminous Cas. Corp. v. Sand Livestock Sys., Inc.*, 728 N.W.2d 216, 221 (Iowa 2007)

("[T]he mere fact that parties disagree on the meaning of terms does not establish ambiguity. The test is an objective one: Is the language fairly susceptible to two interpretations?" (quoting *N. Star Mut. Ins. Co. v. Holty*, 402 N.W.2d 452, 454 (Iowa 1987)) (internal quotation marks omitted)).

Second, this argument fundamentally misapprehends the consequence of a finding of ambiguity. Under Iowa law, if there is an ambiguity—i.e., "[i]f the words are fairly susceptible to two interpretations"—that means that "the one which will sustain the insured's claim will be accepted." *Cent. Bearings Co. v. Wolverine Ins. Co.*, 179 N.W.2d 443, 445 (Iowa 1970). It does not mean, as Defendants repeatedly suggest, that the policy automatically applies to the Underlying Actions. *See* Defs.' Resp. to CIC at 22; *see also, e.g.*, Defs.' Resp. to CIC at 19–20 (arguing that "coverage must be afforded" because the definition of "underlying limit" in the CIC Policies is ambiguous, without explaining how the alleged ambiguity might affect any argument made by CIC or how either of their proposed interpretations would sustain a claim for coverage).

■ Returning to the issue of coverage, the "personal injuries" alleged by Claimants became apparent no later than 1978, the year in which Claimants were convicted. Therefore, these injuries should be

relevant definition of "occurrence." *Compare id. with* CIC App. at 71, 90. It appears that CIC has conflated the definition of "occurrence" that applies for "personal injury" with the definition of occurrence that applies to "bodily injury" and "property damage." *See* CIC App. at 71 ("As respect COVERAGES A and B, 'occurrence' means an accident, or event including continuous or repeated exposure to conditions, which results during the policy term, in bodily injury or property damage neither expected nor intended from the standpoint of the Insured ...."); *see also id.* at 66 (indicating that COVERAGES A and B

pertain to "bodily injury" and "property damage").

20. Defendants also argue that "[b]y including the word 'any,' Admiral has expressly removed the possibility that the policies could be read to require that the injury or damage FIRST appear during the policy period." Defs.' Resp. to CIC at 22. The Court does not agree. Defendants' argument pertains to the issue of which trigger rule should be used and that question does not really depend on the policy language. *See supra* Section III(A)(1).

deemed to have occurred, for insurance purposes, no later than 1978. *See supra* Section III(A)(1). The CIC Policies became effective after 1978. *See* CIC Facts ¶¶ 8–9. Therefore, Claimants' claimed injuries did not occur, for insurance purposes, during the relevant policy periods. Thus, Defendants have failed to make a showing sufficient to establish that the Underlying Actions are "comprehended by the policy's general coverage provisions." *See Modern Equip. Co.,* 355 F.3d at 1128. Accordingly, CIC is entitled to summary judgment that the CIC Policies do not provide coverage for the Underlying Actions.

### C. *Columbia's Motion*

As discussed above, Defendants bear the initial burden of proving that the claims in the Underlying Actions are "comprehended by the policy's general coverage provisions." *See Modern Equip. Co.,* 355 F.3d at 1128. Columbia argues that Defendants cannot prove that any of its policies cover the claims in the Underlying Actions. Columbia makes separate arguments regarding: (1) the five policies that became effective after August 4, 1978— *i.e.,* the Umbrella Policy and Special Excess Policies No. SXP 358 38 97, SXP 358 39 95, SXP 358 42 88, and SXP 358 40 43 (hereinafter the "Post–Conviction Policies"); and (2) Special Excess Policy No. SXP 358 38 48 (the "1977–78 Excess Policy"). The Court will address these arguments in turn.

### 1. *The Post–Conviction Policies.*

It is undisputed that McGhee was convicted on May 11, 1978 and Harrington was convicted on August 4, 1978. Columbia argues, essentially, that Defendants cannot prove there is coverage under the Post–Conviction Policies because Claimants "do not allege any [covered personal] injury" during their policy periods. *See* Columbia Br. at 9–10.

In response, Defendants argue that "there is no indication in the policies themselves that there is coverage if and only if the injury FIRST occurs during the term of the insurance policy."[21] Defs.' Resp. to Columbia at 7. Specifically, Defendants argue that if the Court deems the injuries to have "occurred," for insurance purposes, at the time of Claimants' convictions, it will be "essentially add[ing] language to the policies in violation of the Iowa rules governing interpretation and construction of insurance policies." The Court does not agree, for the reasons stated in Section III(A)(1).

Defendants also argue that "[t]he policy is, at a minimum, ambiguous and the ambiguity must be construed against Columbia with resultant coverage to the . . . Defendants." Defs.' Resp. to Columbia at 9. Specifically, Defendants argue that:

> If the policies in question are clear and the exclusion from coverage relied upon by Columbia were not ambiguous, how does one explain the interpretation of the policies provided by the Columbia claim representatives themselves? It can't be done. Because of the adhesive nature of insurance policies, their provisions are construed in the light most favorable to the insured. *Ferguson v. Allied Mut. Ins. Co.,* 512 N.W.2d 296, 299 (1994); *A.Y. McDonald Indus. Inc.,* 475 N.W.2d at 619; *Krause v. Krause,* 589 N.W.2d 721, 726 (Iowa 1999). The benefit of the doubt is interpreted against the insurance company. *Westfield Ins. v. Economy Fire & Cas.,* 623 N.W.2d 871, 875–876 (Iowa 2001). The

---

21. Defendants also "adopt . . . in full" the arguments they made in opposition to CIC's motion. Defs.' Resp. to Columbia at 7. To the extent any such arguments are effectively incorporated, the Court rejects them for the reasons stated in Section III(B).

result is coverage for the City Defendants.

*Id.* at 10. By "the interpretation of the policies provided by the Columbia claim representatives themselves" it appears that Defendants are referring to five pieces of extrinsic evidence from 2005 and 2007. *See id.* at 8–9. As discussed in Section III(a)(2), this evidence is not admissible unless there is an ambiguity. However, Defendants have still failed to identify an actual ambiguity—*i.e.*, specific policy language that "is susceptible to two *reasonable* interpretations." *See Nationwide*, 782 N.W.2d at 470. Defendants' mere suggestion that "the policies in question" are not "clear" is not sufficient. *Cf. Cairns v. Grinnell Mut. Reinsurance Co.*, 398 N.W.2d 821, 824 (1987) ("Ambiguity is not present merely because the provision 'could have been worded more clearly or precisely than it in fact was.'" (quoting *Fraternal Order of Eagles, Waterloo Aerie No. 764 v. Ill. Cas. Co.*, 364 N.W.2d 218, 221 (Iowa 1985))).

 Defendants also argue that "the language of the Columbia policies" provide coverage; however, they do not explain how of the language in any of the Columbia policies actually applies to the claims in the Underlying Actions. *See* Defs.' Br. re Columbia at 12. Defendants suggest that "the 'exposure to conditions' in prison during the terms of the policies" resulted in some unspecified type of "injury during that time." *See id.* However, the Um-

brella Policy does not contain any "exposure to conditions" language in its definition of "occurrence." [22] *See* Columbia App. at 127. Therefore, Defendants have failed to show that there is coverage under the Umbrella Policy.

The Special Excess Policies, on the other hand, define "occurrence" as "an accident, including injurious exposure to conditions" that "*results* . . . in personal injury" during the policy period. *E.g.*, Columbia App. at 67 (emphasis added). However, Defendants have failed to identify any covered "personal injury" that actually occurred in or after 1978—let alone one that was caused by any "injurious exposure to conditions." *See* Defs.' Br. re Columbia at 11–12. Defendants argue—as far as the Court is able to surmise their meaning— that there is coverage because Claimants allege "personal injuries" (*i.e.*, the malicious prosecution or discrimination) that resulted in "injurious exposure to conditions' in prison." [23] *See* Defs.' Br. re Columbia at 12; *see also* McGhee Br. at 9 ("Harrington and McGhee were imprisoned throughout this period, and they allege their imprisonments arose from malicious prosecution and the violation of civil rights. Such allegations constitute occurrences of personal injury as defined in these policies, i.e., injurious exposure to conditions during the 1978–82 time frame *arising from* malicious prosecution and race discrimination." (emphasis added)).

**22.** As McGhee points out, the Umbrella Policy incorporates the provisions of its "immediate underlying policy," Admiral Policy No. A2CM3044, by reference. *See* McGhee Br. at 10 (citing, *inter alia*, Columbia App. at 111–12). However, the relevant definition of "occurrence" in that policy does not contain the "exposure to conditions" language relied upon by Defendants. *See* McGhee App. at 18 ("[A]s respects COVERAGE D, 'occurrence' means any injury or damage sustained during the policy term, by any person or organiza-

tion and arising out of the personal injury . . . ."); *see also id.* at 13 (indicating that "COVERAGE D" applies to "PERSONAL INJURY LIABILITY").

**23.** McGhee also argues that Claimants' imprisonment "constitutes personal injury . . . covered by the policies." McGhee Br. at 14. However, McGhee fails to explain how imprisonment is comprehended by any part of the relevant definition of "personal injury."

986

However, the Special Excess Policies do not cover "personal injuries" that result *in* "injurious exposure to conditions"; they cover "personal injuries" that result *from* "injurious exposure to conditions." *E.g.,* Columbia App. at 67. Therefore, this argument fails under the plain text of the policy.[24]

Moreover, the "personal injuries" alleged by Claimants became apparent no later than August 4, 1978, when the Claimants were both convicted. Therefore, these injuries should be deemed to have occurred, for insurance purposes, no later than August 4, 1978. *See supra* Section III(A)(1). Therefore, Claimants' claimed injuries did not occur, for insurance purposes, during the periods covered by the Post–Conviction Policies.

Accordingly, Defendants have failed to make a showing sufficient to establish that the Underlying Actions are "comprehended by the [Post–Conviction Policies'] general coverage provisions."[25] *See Modern Equip. Co.,* 355 F.3d at 1128. Columbia is entitled to summary judgment that the Post–Conviction Policies do not provide coverage for the Underlying Actions.

### 2. *The 1977–78 Excess Policy.*

Columbia argues that Defendants cannot prove there is coverage under the 1977–78 Excess Policy[26] because:

The Columbia Special Excess Policies define an "occurrence" as "an accident, including injurious exposure to conditions, which results, during the policy period, in personal injury or property damage **neither expected nor intended from the standpoint of the insured.**" (Emphasis added.) (App. CCC0017–0018 and CCC 162–0163; Complaint and Answer at ¶ 106.) As Judge Pratt recognized in [*Gulf Underwriters,* 755 F.Supp.2d at 1004], the underlying lawsuits do not allege any injuries "arising from any unexpected or unintended events." (App. CCC0249). Accordingly, there is no coverage ... because no "occurrence" has been alleged.

Columbia Br. at 10. In response, Defendants and McGhee argue that: (1) "[t]he provision purportedly requiring that the injury not be expected or intended from the standpoint of the insured is not enforceable,"[27] *see* Defs.' Resp. to Columbia at 16; *see also* McGhee Br. at 22–23; and (2) the 1977–78 Excess Policy *does* provide

---

24. Additionally, the arguments made by Defendants and McGhee "place 'considerable strain on the words "exposure" and "conditions." ' " *See N. River Ins. Co.,* 428 F.Supp.2d at 1292 (quoting *Metro. Life Ins. Co. v. Aetna Cas. & Sur. Co.,* 255 Conn. 295, 765 A.2d 891, 900 (2001) and citing *Koikos v. Travelers Ins. Co.,* 849 So.2d 263, 268 (Fla.2003)). The words " '[e]xposure' and 'generally harmful conditions' conjure images of lead based paint and asbestos fibers, not false imprisonment and malicious prosecution." *See id.*

25. For the same reason, McGhee's arguments regarding coverage under Admiral Policy No. A2CM3044 also fail. *See* McGhee Br. at 10–11.

26. Technically, Columbia makes this argument regarding all of the Special Excess Policies. *See* Columbia Br. at 10.

27. Defendants also argue that "[e]ven if the provision denying coverage if the injury were 'expected or intended' were enforceable, it would not operate to exclude coverage for the City[,] ... whose coverage must be determined separately." Defs.' Resp. to Columbia at 20 (citing *United Fire & Cas. Co. v. Shelly Funeral Home, Inc.,* 642 N.W.2d 648 (Iowa 2002)). Thus, according to Defendants, this provision does not "obviate coverage." *Id.* However, Defendants have failed to point to any evidence that indicates that there is any genuine issue of material fact as to the City's knowledge; therefore, this argument is not sufficient to avoid summary judgment. *See generally* Fed.R.Civ.P. 56.

coverage for the Underlying Actions, *e.g.*, McGhee Br. at 8–9. The Court will address their arguments in turn.

### a. The *"neither expected nor intended"* language.

According to Defendants, because of this "neither expected nor intended" language, the definition of "occurrence" in the 1977–78 Excess Policy provides: "We provide coverage for intentional torts UNLESS they are intentional torts." *See id.* at 17. Thus, according to Defendants, the definition "renders the contract ambiguous" and violates the doctrine of reasonable expectations. *See id.* at 19. McGhee argues that the "neither expected nor intended" language is not a valid limitation on coverage.[28] *See* McGhee Br. at 22. The Court will consider each of these arguments in turn.

#### i. *Ambiguity.*

Defendants argue that the definition of "occurrence" in the 1977–78 Excess Policy "renders the contract ambiguous as it creates an inconsistency between and among various provisions and the ambiguity must be construed against the insurer for all of the reasons noted in the above authorities." Defs.' Resp. to Columbia at 19. The "above authorities" consist of a quotation from a treatise followed by a long and ill-organized amalgam of case quotations and (what appears intended to be) a string cite to a number of cases from outside of Iowa. *See id.* at 17–19. Whatever the merits of "all of the reasons" in these nonbinding authorities may be, the law *in Iowa* regarding contract ambiguities is clear.[29]

In Iowa, "[t]he test [for ambiguity] is an objective one: Is the language fairly susceptible to two interpretations?" *Bituminous Cas.*, 728 N.W.2d at 221 (quoting *N. Star Mut. Ins.*, 402 N.W.2d at 454). Defendants have failed to identify any portion of this definition that is fairly susceptible to two interpretations. Therefore, Defendants have failed to establish that there is an ambiguity under Iowa law.

#### ii. *Doctrine of reasonable expectations.*

■ According to Defendants, "Iowa applies the doctrine of reasonable expectations to avoid an insurance policy limitation that: '(1) is bizarre or oppressive; (2) eviscerates terms explicitly agreed to; or

---

28. McGhee also speculates that the "neither expected nor intended" language was "likely a mistake on [Columbia's] part." McGhee Br. at 23. However, McGhee has not provided any evidence showing that there is a genuine factual dispute on this issue. *See id.; see also Doe v. Dep't of Veterans Affairs*, 519 F.3d 456, 460 (8th Cir.2008) ("In order to create an issue for trial the nonmoving party must produce sufficient evidence to support a verdict in [its] favor based on more than 'speculation, conjecture, or fantasy.'") (quoting *Putman v. Unity Health Sys.*, 348 F.3d 732, 733–34 (8th Cir.2003)).

29. Indeed, Defendants' argument—as far as the Court is able to discern—appears to be based on a reading of the policy that is contrary to well-established Iowa law. Specifically, to the extent that Defendants are suggesting that a reasonable insured would read—and rely upon—the definition of "personal injury" but not the definition of "occurrence," *see* Defs.' Resp. to Columbia at 17, that argument would be contrary to the longstanding presumption that a party to a contract has read that contract, *see Adams v. Iowa Gas & Elec. Co.*, 200 Iowa 782, 203 N.W. 229, 230 (1925) and the rule that "a contract is to be interpreted as a whole," *Seneca Waste Solutions, Inc. v. Sheaffer Mfg. Co., LLC*, 791 N.W.2d 407, 412 (Iowa 2010) (quoting *Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents*, 471 N.W.2d 859, 863 (Iowa 1991)). Additionally, to the extent that Defendants are suggesting that Columbia intentionally mislead them by using this definition of "occurrence," that argument fails because Defendants have not pointed to any *evidence* that indicates any such malfeasance—let alone any evidence that Defendants actually relied upon such malfeasance. *See* Defs.' Resp. to Columbia at 17.

(3) eliminates the dominant purpose of the transaction.'" Defs.' Resp. to Columbia at 19 (quoting *Joffer*, 574 N.W.2d at 311 and citing *R & J Enterprizes v. Gen. Cas. Co. of Wisc.*, 627 F.3d 723 (8th Cir.2010)). Defendants argue that the "neither expected nor intended" language in the 1977–78 Excess Policy "does all three." *Id.* However, they do not support this argument with any further explanation or analysis. *See id.* Therefore, the argument fails.[30]

### iii. *Limitation or exclusion.*

McGhee asserts that in the Special Excess Policies, including the 1977–78 Excess Policy, Columbia "agreed to provide coverage for the intentional torts of false arrest, malicious prosecution and racial discrimination." McGhee Br. at 22 (citing Columbia Facts ¶¶ 12–13 and Columbia App. at 15, 17–18). Therefore, according to McGhee, Columbia cannot limit its coverage to personal injuries "neither expected nor intended from the standpoint of the insured" without clear and explicit exclusionary language. *See id.* (citing *A.Y. McDonald*, 475 N.W.2d at 619). Specifically, McGhee argues that "[a] policy that affords coverage for intentional torts and then purports to take it away on 'expected or intended' grounds is in conflict with itself," in violation of "the 'clear and explicit' requirement." *Id.* at 22–23.

However, McGhee's argument is based on a flawed premise. It is true that, in *A.Y. McDonald*, the Iowa Supreme Court stated that "an insurer should clearly and explicitly define any limitations or exclusions to coverage expressed by broad promises." 475 N.W.2d at 619. But McGhee has failed to identify any "broad promises" that are contradicted by the "neither expected nor intended" language. *See* McGhee Br. at 22. The 1977–78 Excess Policy does broadly promise to provide coverage for "damages because of ... personal injury ... caused by an occurrence." Columbia App. at 45. It does not expressly promise to provide coverage for "damages because of ... malicious prosecution" or "damages because of ... discrimination." [31] *See id.* And although the 1977–78 Excess Policy does define "personal injury" to include "malicious prosecution" and "discrimination," McGhee does not cite—and the Court is not aware of—any authority indicating that contractual

---

**30.** McGhee also argues that Columbia has violated the doctrine of reasonable expectations, but for different reasons. *See* McGhee Br. at 7–8. McGhee asserts that, after the City made its insurance claim, Columbia "represent[ed] to the [City] that there [was] coverage under the 1977–2003 policies" and, therefore, its current claim that "only one [policy] applies" violates "Iowa's 'reasonable expectations' doctrine." *Id.* According to McGhee, "it would violate the City's reasonable expectations ... to allow [the insurance carriers] to now change their tune and argue that only one policy applies." *Id.* The Court does not agree. Even if the Court assumes *arguendo* that the documents cited by McGhee constitute representations that all of the policies from 1977 to 2003 were triggered, the doctrine of reasonable expectations "applies only to representations made by the insurer *at the time of policy negotiation and issuance.*"

*Vos v. Farm Bureau Life Ins. Co.*, 667 N.W.2d 36, 50 (Iowa 2003) (emphasis added). All of the "representations" cited by McGhee significantly postdate that time and, thus, are not relevant.

**31.** Even when the broad promise to cover "damages because of ... personal injury ... caused by an occurrence," Columbia App. at 45, is read in light of the definitions, it must be read in light of *both* the definition of "personal injury" *and* "occurrence"—not just the definition of "personal injury." Read in that way, the "neither expected nor intended" language is not a limitation to a broad promise—it is one of the contours of that broad promise. Indeed, McGhee has not provided any support for his suggestion that the definition of "personal injury" should be given some type of preeminence over the definition of "occurrence."

definitions constitute the type of "broad promises" contemplated in A.Y. McDonald.

### b. *Coverage under the 1977–78 Excess Policy.*

The 1977–78 Excess Policy covers "personal injuries," such as malicious prosecution and discrimination, that are "caused by an occurrence."[32] Columbia App. at 45, 48. As discussed above, the 1977–78 Excess Policy defines "occurrence" as "an accident, including injurious exposure to conditions, which results, during the policy period, in personal injury or property damage neither expected nor intended from the standpoint of the Insured." *Id.* at 48. Therefore, in order to meet their burden, Defendants must show that, *inter alia,* Claimants are claiming that they were injured, during the policy period, by an "accident."[33] *See id.* The 1977–78 Excess Policy does not define the term "accident." *See id.* at 47–48. Therefore, the term must be given its ordinary meaning. *See Cent. Bearings,* 179 N.W.2d at 445. The Court notes that in *Weber v. IMT Insurance Co.,* the Iowa Supreme Court defined "accident" as "an unexpected and unintended event." 462 N.W.2d 283, 287 (Iowa 1990). The Court finds that this definition fairly captures the ordinary meaning of the word and, therefore, adopts the *Weber* definition of the term "accident" for its analysis of the 1977–78 Excess Policy.

In this case, Claimants have not alleged any injuries arising from any unexpected or unintended events, or from anything that could reasonably be described as "ac-

cidents." Indeed, neither Defendants nor McGhee argue that any of Claimants' injuries were caused by "accidents." Thus, the 1977–78 Excess Policy does not provide coverage for any "personal injuries" alleged by Claimants. Therefore, Defendants have failed to make a showing sufficient to establish that the Underlying Actions are "comprehended by the [1977–78 Excess Policy's] general coverage provisions." *See Modern Equip. Co.,* 355 F.3d at 1128. Accordingly, Columbia is entitled to summary judgment that the 1977–78 Excess Policy does not provide coverage for the Underlying Actions.

## IV. CONCLUSION

For the foregoing reasons, "Plaintiff Chicago Insurance Company's Motion for Summary Judgment" (Clerk's No. 28) and "Columbia Casualty Company's Motion for Summary Judgment" (Clerk's No. 29) are GRANTED.

IT IS SO ORDERED.

---

**32.** The Court notes that neither Defendants nor McGhee have suggested—let alone expressly argued—that any of the other types of "personal injuries" (*e.g.,* "mental anguish") are relevant to this case. *See* Defs.' Resp. to Columbia at 16 ("A personal injury includes 'false arrest, detention or imprisonment or malicious prosecution ....'" (quoting Columbia App. at 17–18, 162–64)); McGhee Br. at 9 ("The [Columbia] policies defined "personal injury" in relevant part to mean (b) false arrest, detention or imprisonment or malicious prosecution; ... (e) discrimination based upon race ...." (omission in original)).

**33.** Notably, neither Defendants nor McGhee make any challenge to the requirement that an "occurrence" be "an accident." Defs.' Resp. to Columbia at 1–21; McGhee Br. at 1–27.